THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
WILLIAM SEYMOUR, Defendant-Appellee.

First District (3rd Division)    No. 78-2033

Opinion filed December 31, 1979.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Paul C. Gridelli, and Christopher Cronson, Assistant State's Attorneys, of counsel), for the People.

Sam Adam, Marvin Bloom, and Arnette Hubbard, all of Chicago, for appellee.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

A strip search is humiliating, degrading and embarrassing. Nevertheless, at times efficient police procedures require that arrestees undergo that kind of search to protect the safety of police officers, to maintain order in jails and to disclose the fruits of a crime. These legitimate public needs do not justify a strip search under the circumstances with which we deal in this case—an arrest made for a minor offense, one the legislature has labeled a misdemeanor, where the arrestee is able to satisfy the amount of bail which has been preset by judicial rule and where there is no need to incarcerate the arrestee or even detain him at the station house for more than a brief period needed by the police to determine whether he is subject to a more serious charge.

William Seymour was arrested for a minor offense, then taken to the police station and strip searched. He advances several grounds for upholding the circuit court's order suppressing the minute amount of cocaine found in the course of that search. First, the cocaine was found only because police breached their duty to inform Seymour of his right to post bail and gain his immediate release. Second, because of the nature of the accusation against Seymour, the strip search was an unreasonable invasion of his privacy in violation of article I, section 6 of the Illinois Constitution of 1970. Third, the strip search, made without a warrant, did not fall into any of the exceptions to the warrant requirement and was

under the circumstances unreasonable and a violation of his fourth and fourteenth amendment rights.

Before discussing these rationales, it is useful to draw distinctions between the various types of searches of an individual's person. Taken in the order by which they intrude into an individual's privacy, they are: First, the "pat down," in which police frisk a suspect's outer clothing in order to find concealed weapons; second, the "pocket search," in which police rummage through a suspect's pockets, usually to find weapons but also to find the fruits of a crime or contraband; third, the "clothing search," in which police closely examine a suspect's clothes; fourth, the "strip search," in which a suspect is forced to strip naked under the glaring eye of a police examination; fifth, the "body cavity search," in which police strip the suspect naked and examine all openings of the body where contraband or weapons could be secreted; sixth, the "body intrusion," in which the examination goes beyond the outer limits of a suspect's body and the police pump the stomach or remove the blood without consent.

■■ Both the Illinois and the United States Constitutions require that police obtain judicial warrant for their actions before engaging even in reasonable searches that invade an individual's privacy. The explanation for that prohibition was stated long ago by Mr. Justice Jackson in his dissent in *Brinegar v. United States* (1949), 338 U.S. 160, 180-81, 93 L. Ed. 1879, 1893, 69 S. Ct. 1302, 1313:

> "Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police."

■■ The need for swift action in certain limited situations has led to the formulation of several exceptions to the warrant requirement. When police action fits into an exception and is reasonable, the constitutions do not forbid the use of evidence uncovered in a warrantless search. The State seeks to fit the search of Seymour into these exceptions.

# I

Seymour was charged by complaint with possession of a controlled substance, cocaine, in violation of section 402 of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1977, ch. 56½, par. 1402). A preliminary

hearing resulted in a finding of probable cause. The defendant moved to suppress the cocaine seized in the search, and a hearing on his motion disclosed the following evidence.

The parties first stipulated to the testimony of Chicago police sergeant Peter Nielson, given at the preliminary hearing. Nielson had testified that he and Officer Michael Cronin were patrolling North Clark Street in Chicago on July 27, 1977, in a marked squad car when, at about 9 p.m., they saw the defendant leaning through the passenger's window of a car. When the officers pulled their car up behind the parked vehicle, Seymour stood up and began to walk away from them. Nielson got out of the squad, noticed that the parked car had keys in its ignition, and ordered the defendant to stop. Seymour's shirt was hanging outside of his pants as the police approached him. When Sergeant Nielson asked Seymour for some identification, the defendant began to reach into his pants pocket. Before he could, Nielson patted Seymour down.

Nielson found a loaded .38 revolver in Seymour's waistband. The officers immediately placed Seymour under arrest and called for a transport to the 18th District police station. While waiting in Nielson's squad for the transport to arrive, Seymour explained to the officers that the parked car was his and that he had a gun registration card for the revolver. Cronin added that, while waiting, Seymour told Nielson that he had been in the penitentiary before and so asked the sergeant to give him a break. Nielson did not mention such a remark in his testimony, and Seymour denied making it.

Seymour testified that when he was stopped, it was Cronin, not Nielson, who initially patted him down and discovered the concealed weapon. Nielson had testified that Cronin was off duty and out of uniform at the time of the arrest. When a second squad car arrived at the scene to take Seymour to the station, he was again searched. This time, officers both patted him down and performed a pocket search.

When Seymour was arrested, he was carrying both a valid State firearms identification card and $390 in cash. After arriving at the 18th District station he was searched for a third time. This time, police patted him down, searched his pockets and frisked him under his shirt. Seymour was then taken into the station house lockup to be fingerprinted. When his prints had been taken, he was told to wash his hands and was directed to a small washroom just off the lockup.

While Seymour was washing his hands, Officer Cronin entered the washroom. According to Seymour, Cronin said that Seymour was not a good guy, and Cronin patted him down for the fourth time. When Seymour finished drying his hands, Cronin ordered him to take off his clothes. Seymour testified he was stripped naked and a full body cavity search followed. Cronin's testimony was that he first told Seymour to

remove his shoes, searched them, then ordered Seymour to strip naked. He denied that there was a body cavity search.

While searching through Seymour's clothing, Cronin found a tinfoil packet, either in Seymour's shoe or sock. Cronin had seen similar packets before, usually containing heroin or cocaine, and usually concealed in places on a suspect's person which required a search more intrusive than a pocket search. At some later point, Cronin opened the packet, and found that it contained .22 grams, or about 1/100 of an ounce, of cocaine.

Cronin claimed at the hearing on the motion to suppress that the police department had issued a general order requiring that all persons arrested be put into the lockup so that they could be fingerprinted, but when challenged by defense counsel he could not specify which general order it was. He also testified that at the 18th District station certain arrestees—those picked up for drunk and disorderly or disorderly conduct, as well as traffic offenders—are not fingerprinted at all and are not taken into the lockup. Instead, they are put in a small room located behind the booking sergeant's desk, so that the arresting officer can talk to them while filling out the arrest report and preparing charges.

Cronin testified that to find out an arrestee's record, police procedure is to fingerprint the arrestee and wait 2 to 3 hours until the criminal history sheet comes back from the Bureau of Identification. Cronin described an alternate identification procedure which is also used in which the arrestee's name is checked against the Chicago Police Department's "alpha file." This method is quicker but less complete than checking fingerprints. Cronin did not know if there was a police department order requiring that all persons taken into the lockup be strip searched. He said that the decision to strip search any given arrestee was his, to be exercised at his own "personal, individual discretion."

Cronin acknowledged that he would know the amount of Seymour's bail if the offense for which he had been arrested was a misdemeanor. Seymour testified he was never told of his right to post bail. He testified that he told the arresting officers about the money he was carrying, but Cronin stated that Seymour never exactly said how much money he had.

The circuit court refused to suppress the .38 revolver. However, it ruled that while police could validly detain the defendant for a reasonable time after his arrest, to prepare charges and check identification, 2 to 3 hours was unreasonably long. The court found that Seymour was only charged with the misdemeanor offense of unlawful use of weapons, and that since this was a bondable offense with bail set by rule of the supreme court, the defendant should have been told of his right to post bail and be released immediately. If he had, Seymour would never have had to enter the lockup, and so would never have been strip searched.

The State's position on appeal can be briefly stated. It is that Officer

Cronin reasonably thought that Seymour had been in the penitentiary within 5 years of his arrest, and therefore carrying a concealed weapon would be a felony instead of a misdemeanor. (Ill. Rev. Stat. 1977, ch. 38, par. 24—1(a)(4), (b).) If a felony, Seymour's offense was not covered by the supreme court rules on bail in misdemeanor offenses and he would have to be locked up to await a court appearance for bail to be set. The State argues that the strip search was therefore lawful and reasonable, either as a search incident to a full custodial arrest or as an inventory search prior to incarceration.

## II

■■ The standard of review of a suppression order is whether the trial court's ruling was manifestly erroneous. (*People v. Van Note* (1978), 63 Ill. App. 3d 53, 379 N.E.2d 834.) The circuit court's ruling here that Seymour was arrested on a bondable misdemeanor offense was not erroneous. The trial judge stated that he was not convinced by Cronin's testimony that Cronin thought at the time of the arrest that Seymour was a convicted felon. This was understandable, especially since the State chose not to present the testimony of Nielson, to whom Seymour's penitentiary remark was directed, but rather introduced the evidence through the testimony of a mere bystander.

■■ In addition, it is undisputed that Seymour was carrying an apparently valid State firearms identification card. The police had no reason to believe it was invalid. Even assuming that Seymour told police that he had served some time in prison, the fact that he had what appeared to be a valid firearms identification card indicated he had not been in prison during the 5 years before his arrest. (Ill. Rev. Stat. 1977, ch. 38, par. 83—4(a)(2)(ii).) Thus, the trial court did not err in holding that Seymour did not have to submit to a 3-hour identification process to determine what offense he could be charged with.

Since the defendant was arrested on a charge of unlawful use of weapons, a misdemeanor, the amount of his bail was governed by the supreme court rules on bail in misdemeanor offenses. Bail is a constitutional right (U.S. Const., amend. VIII; Ill. Const. 1970, art. I, §9) and the legislature has authorized the supreme court to prescribe a uniform schedule of bail amounts for misdemeanors. Ill. Rev. Stat. 1977, ch. 38, par. 110—15.

■■ Supreme Court Rule 528(c) sets the amount of bail for misdemeanor unlawful use of weapons (Ill. Rev. Stat. 1977, ch. 110A, par. 528(c)), and under that Rule and Rule 530 (Ill. Rev. Stat. 1977, ch. 110A, par. 530), Seymour was entitled to immediate release upon depositing $100 with either the clerk of the circuit court or with any police officer. Ill. Rev. Stat. 1977, ch. 38, pars. 110—7(a), 110—7(b), 110—9.

The misdemeanor bail scheme established by statute and rule provides for quick release from custody. As the supreme court noted:

"Bail is present to avoid undue delay in freeing certain persons accused of an offense when, because of the hour or the circumstances, it is not practicable to bring the accused before a judge. When the accused is actually brought before a judge, the bail amounts specified in these rules do not control. Nothing in these rules is intended to limit a peace officer's discretion to issue a Notice to Appear in an appropriate case * * *." Ill. Rev. Stat. 1977, ch. 110A, art. V, part B.

If the police were not pleased with Seymour's release on $100 bond, they could issue a citation and require his appearance before a judge the next morning to set a higher bail. (Ill. Rev. Stat. 1977, ch. 38, par. 107—12.) Failure to appear would be grounds for his rearrest. But police could not, once Seymour told them he had ample money to post bond, unreasonably continue to keep him in custody.

## III

■■ The circuit court did not err in holding that police officers are required to inform misdemeanor arrestees of their right to post bail and be released. Long before Seymour's arrest, the legislature had shown its desire that arrestees be informed of their rights, among them the right to bail, by enacting section 103—7 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 103—7). This provision requires that the statutes governing, *inter alia*, the right to post bail be displayed where persons awaiting bail can read them. Illinois court decisions and statutes now require that police additionally inform arrestees of their right to remain silent (*People v. Smith* (1969), 108 Ill. App. 2d 172, 246 N.E.2d 689), their right to counsel (*People v. Pagan* (1972), 52 Ill. 2d 525, 288 N.E.2d 102), of the arresting officers' authority (*People v. Sprovieri* (1969), 43 Ill. 2d 223, 252 N.E.2d 531), and of the precise offense on which the arrest is based (Ill. Rev. Stat. 1977, ch. 38, par. 103—1(b)). Adding to this a duty to inform misdemeanor arrestees of their right to post bail in a preset amount does not put an onerous burden on police, especially because this can be the responsibility of one desk officer at the station. Furthermore, under the bail statute police already play an active role in accepting bail.

By interpreting the statute and rule as requiring the police to inform Seymour of his right to post a preset bail the circuit court followed the lead of courts in other States with similar preset bail amounts for minor offenses. (See *People v. Dixon* (1974), 392 Mich. 691, 222 N.W.2d 749; *People v. Currie* (1975), 59 Mich. App. 659, 229 N.W.2d 818; *People v. Glass* (1977), 73 Mich. App. 156, 250 N.W.2d 812; *People v. Overlee*

(1971), 174 Colo. 202, 483 P.2d 222; *People v. Superior Court* (1972), 7 Cal. 3d 186, 496 P.2d 1205, 101 Cal. Rptr. 837; *People v. Longwill* (1975), 14 Cal. 3d 943, 538 P.2d 753, 123 Cal. Rptr. 297; *United States v. Mills* (D.C. Cir. 1972), 472 F.2d 1231.) It is important to note that the circuit court did not rule that police had to give the defendant a reasonable opportunity to raise the bail before taking him into the lockup. Other States have taken that step (*cf. State v. Jetty* (Mont. 1978), 579 P.2d 1228; *State v. Gwinn* (1973), 12 Or. App. 444, 506 P.2d 187; *Zehrung v. State* (Alas. 1977), 569 P.2d 189), but it is not necessary to do so here, since Seymour had the money necessary to pay his $100 bond in his possession and the police were so informed.

■■ The circuit court ruled that even after learning that Seymour could post bond, police could detain him a reasonable time to complete their investigation and fill out their arrest reports. That ruling was also correct. As noted earlier, police could not be sure what offense Seymour had committed until they could determine if he had been in the penitentiary in the past 5 years. But, during this reasonable detention, police could not incarcerate the defendant. He, like other misdemeanants, should have been kept in the small room behind the booking sergeant's desk. There he would be available for questioning which would facilitate the preparation of the charges, and there, after four pat-down searches and several pocket and clothes searches, he would pose no threat to the police.

■■■ Seymour should not have been taken into the lockup simply to be fingerprinted. A proper concern for the reasonable expectations of privacy of misdemeanor arrestees soon to be released on bail required the police to locate their fingerprint and other identification equipment outside the region of maximum confinement. It was unnecessary to put the apparatus behind steel bars. As was said in *State v. Jetty* (Mont. 1978), 579 P.2d 1228, 1230:

> "The only excuse given was that [placing the arrestee in a holding cell] was standard procedure at the jail. It was explained that * * * there was no jailer and the arresting officer had to get back on patrol. Lack of manpower and standard procedure cannot eliminate the individual's constitutional right to be free from unreasonable search and seizure."

■■ ■ Implicit in the statutes and rules setting forth the bail amounts for minor offenses is the arrestee's right to immediately post bail and avoid the indignity of being placed in full custodial incarceration in the station house lockup. To protect that right, police must, when they book the arrestee for violating a minor offense, explain the amount of bail the arrestee must post to be released. Police in this case did not do so. The fruits of their breach of duty were therefore properly suppressed. We can see no other practical method by which the courts can insure that

police will fulfill their duty and so protect a misdemeanant's right to speedy release on bail. (See *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 64 L. Ed. 319, 40 S. Ct. 182; *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) The circuit court was correct in suppressing the cocaine.

## IV

The suppression order was correct for a second, alternative reason: the strip search was an unconstitutional violation of Seymour's privacy. Article I, section 6 of the Illinois Constitution of 1970 provides:

> "The people shall have the right to be secure in their persons * * * against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means."

Section 6 protects against highly intrusive invasions, although its further scope has not yet been defined (see *Illinois State Employees Association v. Walker* (1974), 57 Ill. 2d 512, 315 N.E.2d 9; *Oden v. Cahill* (1979), 79 Ill. App. 3d 768, 398 N.E.2d 1061).

The right to privacy protects only against unreasonable intrusions. (*Illinois NORML, Inc. v. Scott* (1978), 66 Ill. App. 3d 633, 638, 383 N.E.2d 1330, 1334.) Lawful incarceration deprives prisoners of many of the rights and privileges of other citizens, and warrantless searches of jail cells and prisoners under certain conditions do not violate article I, section 6. (*People v. Elkins* (1978), 60 Ill. App. 3d 883, 377 N.E.2d 569.) But the strip search of an individual arrested for a misdemeanor offense who has the funds in his possession to immediately post bond and be released is not reasonable. A strip search can be justified when "* * * the modesty of one lawfully arrested must give way to reasonable precautionary procedures designed to detect hidden evidence, drugs or objects which might be used against others or to cause self-inflicted harm." (*United States v. Klein* (1st Cir. 1975), 522 F.2d 296, 300-01.) However, when the defendant is charged only with a misdemeanor and may gain his release immediately, his modesty and privacy must remain inviolate. The offense for which Seymour was arrested had no fruits which might have been hidden upon him. Because there was no justification for taking him into the lockup, there was no need to discover contraband which could disrupt the order of that secured area. And, Seymour having already been patted down four times, his pockets having been searched twice and his clothes once, there was no reasonable need for a strip search to protect the police officers from any hidden weapons while he was being detained. Because it was improper to incarcerate Seymour, no inventory search was necessary here.

■■ There was no justification for this search. Consequently, it was unreasonable and a violation of the defendant's right to privacy under the Illinois Constitution; the cocaine was properly suppressed.

■■ It should be noted that Seymour insisted that he had been the subject of a body cavity search in the washroom of a station house lockup by an off-duty and out-of-uniform officer. Such a search was hardly professional. For a body cavity search to be reasonable, there must be safeguards which strictly limit the intrusion and protect the arrestee's health and privacy. (See *United States ex rel. Guy v. McCauley* (E.D. Wisc. 1974), 385 F. Supp. 193 (body cavity search should be performed by medical personnel); accord, *United States ex rel. Wolfish v. Levi* (S.D.N.Y. 1977), 439 F. Supp. 114; *United States v. Lilly* (5th Cir. 1978), 576 F.2d 1240 (decision to make a body cavity search should not be arbitrary and subject should be given notice of the impending intrusion).) A body cavity search of the kind described by the defendant would be unreasonable and a violation of section 6. However, the body cavity search, although clearly not justified in this case if it did take place, has no relevance to our decision because the cocaine was found during the strip search.

One charged with a minor offense who is brought to the station house to determine whether he is eligible to post a preset bond should not be made the prey of a fishing expedition for evidence of other guilt.

● 17 In affirming the suppression order we hold little sympathy for Seymour who, after all, was found to be carrying a controlled substance. But we reach this conclusion to protect others who, when being processed through the station house for minor offenses which do not require appearance before a judicial officer to be bailable, may be subjected to the humiliation, degradation and embarrassment of strip or body cavity searches. Publicity after the fact may illuminate their plight but will not prevent it; the circuit court was correct in using its power to suppress evidence to deter strip searches in the future in cases like this which involve an unreasonable invasion of privacy.

In view of these conclusions, it is not necessary to discuss Seymour's reliance on the fourth amendment.

Judgment affirmed.

McNAMARA and McGILLICUDDY, JJ., concur.