UNITED STATES of America,

v.

Craig Richard CLYMORE a/k/a Craig Richards, Leonard Wiley, Robert A. Lee, Philip Moseman, Dale E. Donnell, Kim Mowitz, Diane Moseman, Helen Plesko, and Kenneth A. Grissom, Defendants.

No. CR 81–00085.

United States District Court,
E. D. New York.

June 15, 1981.

---

James Bing, New York City, James A. Pascarella, Garden City, N. Y., for defendants Wiley and Lee.

E. R. Korman, U. S. Atty. E.D.N.Y. by Thomas G. Roth, Asst. U. S. Atty., Brooklyn, N. Y., for United States.

## MEMORANDUM & ORDER

PLATT, District Judge.

Defendants Leonard Wiley and Robert A. Lee, having been indicted for allegedly importing, possessing and conspiring to import, possess and distribute controlled substances, have moved to suppress evidence taken from them during a search conducted at the behest of United States Customs officers. This Court held a number of hearings in the latter part of April and early May to consider these motions and now finds the following facts and arrives at the attendant conclusions of law.

### FACTS

Although the activities presently under consideration occurred on January 23, 1981, to understand the events of that day it is necessary to outline briefly the events of the two previous days.

On January 21, 1981, Ms. Kim Mowitz and Ms. Diane Moseman arrived at Kennedy International Airport on a flight from Frankfurt, Germany. Upon discovering that these travellers had been to Pakistan, a known source country for narcotics, United States Customs officials conducted various searches of them and their baggage and found that they had strapped packets of hashish oil to their bodies. Both were then arrested. (Tr. 41, 83–85).

The true extent of their attempts to smuggle narcotics into the country, however, was not known until Ms. Kim Mowitz suddenly became comatose. She apparently had swallowed a number of condoms filled with hashish oil. One of the condoms had burst and Ms. Mowitz came very close to death as a result of the sudden onrush of the drug into her system. (Tr. 41, 369–70). Fortunately, she recovered.

Subsequent to these events, Customs officials determined that Mlles. Mowitz and Moseman had made reservations and apparently were travelling with five other individuals, viz: Messrs. Craig Richard Clymore, Leonard Wiley, Robert A. Lee, Kenneth Grissom and Ms. Helen Plesko.[1] Further investigation revealed that Messrs. Wiley, Lee, Donnell and Grissom were due in at Kennedy Airport on January 23, 1981, on Lufthansa Flight 404 from Frankfurt, Germany. (Tr. 42, 87). Consequently, awaiting the arrival of that flight were Customs Patrol Officers, among whom were Officers Sanchez and Viccica, with Officer Sanchez taking a position at the immigration embarkation point near the belts bearing luggage for customs inspection. (Tr. 44).

---

1. The Customs officials accomplished this by running a complete check with Lufthansa Airlines, which check revealed that the Mlles. Mowitz and Moseman had bought their tickets at the same time as the others, that all of the reservations had been made at the same time for the same places and that they all were travelling on approximately the same dates. (Tr. 86–88).

1364

At approximately 4:00 PM on January 23, 1981, defendants Wiley and Lee deplaned and forty minutes later approached the Customs area. Mr. Wiley drew near Customs Inspector Daniel S. McDonald who was inspecting baggage and documents and who was checking the Customs computer for information about the deplaning passengers. Upon receiving Mr. Wiley's name, the computer indicated that he had previously been arrested at an airport for attempting to smuggle hashish into the country whereupon Inspector McDonald decided to ask Mr. Wiley to stand aside while he searched Mr. Wiley's bags. He did so but found no contraband. Inspector McDonald summoned Senior Inspector Brummet and relayed to him the pertinent facts. Inspector Brummet then called Officers Sanchez and Viccica and turned Mr. Wiley over to those officers. (Tr. 45–48).

Returning to his belt position, Inspector McDonald was next approached by Mr. Lee. He took Mr. Lee's papers, examined them, and punched Mr. Lee's name into the Customs computer. Mr. Lee's name produced no reaction from the computer but, when the Inspector noted that Mr. Lee had visited Pakistan, his suspicions were aroused. He then queried Mr. Lee on his visit to Pakistan whereupon Mr. Lee quickly reached to his shirt pocket, pulled out a business card and flashed it in the Inspector's face. Not unreasonably, the Inspector found his flurried activity to be a bit odd. (Tr. 220).

Inspector McDonald checked Mr. Lee's luggage and found nothing suspicious. However, upon further examination of Mr. Lee's passport and airline ticket he discovered that Mr. Lee had been to Karachi, Pakistan, the same city visited by Mr. Wiley. He also noticed that Mr. Lee's and Mr. Wiley's luggage tags were numbered sequentially, which indicated to him that they had checked their respective bags at the same time. (Tr. 182–184). Thus, once again did Inspector McDonald summon Senior Inspector Brummet. This time, however, the two Inspectors did not relinquish control of the suspect but rather they themselves took Mr. Lee to a nearby room used for more extensive searches of persons entering the United States. (Tr. 183–184).

As the three entered the room with the understanding that some sort of body search was about to be conducted, Mr. Lee volunteered that he suffered from hemorrhoids. (Tr. 184). Soon thereafter a pat-down search was conducted and Mr. Lee's luggage was examined for a second time, both searches proving negative. (Tr. 185). Inspector McDonald left the room to discuss the situation with other Customs officials at which time he was informed that Mr. Lee was associated with and was travelling with Mlles. Mowitz and Moseman, who had been apprehended two days earlier for attempting to smuggle narcotics. The Inspector then spoke with his supervisor, Ms. Joan Lewis, who, upon learning of the pertinent facts, authorized a strip search of Mr. Lee. (Tr. 185).

During the strip search of Mr. Lee, a wad of tissue paper was found in the backside of his underwear and a reddening was seen around the anal opening, but no contraband could be seen. (Tr. 185–186). Following the strip search, Mr. Lee was asked for, and gave without hesitation, his written consent to undergo X-ray and rectal examination. (Tr. 188). Thereupon, Mr. Lee was transported to the medical facility at JFK Airport.

At approximately 6:20 PM, about an hour and one-half after he first entered Customs, Mr. Lee arrived at the medical facility where he was to be examined by Dr. Lubomyr Woroch. Apparently Mr. Lee cooperated fully with the doctor who, after conducting a rectal probe, ascertained that foreign objects were indeed present in Mr. Lee's large intestine. (Tr. 191–192, 371–372). The doctor then directed that X-rays of Mr. Lee's lower abdomen be taken and these pictures confirmed the doctor's initial diagnosis that Mr. Lee was carrying foreign objects in his lower intestinal area. (Tr. 192, 373). It was at this time that the Customs official informed Mr. Lee that he was being detained pending removal of the substances and read him his rights. (Tr. 193, 256).

At this point, the doctor recommended the use of an oral laxative to facilitate the passing of the foreign objects, and, despite the fact that he vigorously maintained that no such objects existed, Mr. Lee agreed to take a laxative and did so at approximately 6:45. (Tr. 195–196).

Twenty minutes or so elapsed and nothing happened so the Customs officials again approached Mr. Lee and asked him to consider taking an enema to enable him to pass the foreign objects in his system. At that time, Mr. Lee refused and the officials did not press the point; Mr. Lee then asked to make a call to an attorney. (Tr. 196). Unsure of what procedure should be followed, Inspector McDonald called his supervisor who said she would return his call. When she did call back, she told the Inspector that Mr. Lee should be allowed to make his call. Just about that time, Drug Enforcement Agents arrived and also indicated that Mr. Lee was free to call an attorney. Mr. Lee, however, declined the opportunity. (Tr. 196–198).

While the record is not completely clear as to who said what, apparently Dr. Woroch informed Mr. Lee that the presence of foreign objects inside the body could be extremely dangerous to his health, particularly if those objects were packets of narcotics. Also some mention may have been made of the fact that Ms. Mowitz had nearly died when one of the condoms full of hashish oil burst inside of her. (Tr. 199–200, 264, 370). At this time, the doctor asked Mr. Lee for and was given consent to perform a second rectal examination, during which the doctor removed a condom full of opium. Inspector McDonald then arrested Mr. Lee and again advised him of his rights. Soon thereafter Mr. Lee excreted thirteen more condoms which contained heroin. (Tr. 200).

The suspended story of Mr. Wiley, who was left in the custody of Officers Sanchez and Viccica, now shall be resumed. After a search of his luggage proved negative, the officers asked him whether he was travelling by himself or with others. Mr. Wiley responded that he was travelling alone, an answer which the officers thought to be false because of the suspected connection with Mr. Lee and others. (Tr. 49).[2] Mr. Wiley was accordingly escorted to a private search room and, when a pat-down search and another search of his bags revealed nothing, the officers asked him if he knew Ms. Mowitz or Ms. Moseman. Upon his denial, the officers again suspected that he had answered untruthfully. (Tr. 51–53).

A strip search of Mr. Wiley was conducted next but the officers found nothing suspicious save for what they thought to be a reddening around Mr. Wiley's anus and some traces of grease or vaseline. (Tr. 52–53). At this time, Mr. Wiley was read his rights and asked to consent to X-ray and rectal examinations. Mr. Wiley refused and shortly thereafter he was taken out of the search room into an open public area near a luggage carousel. (Tr. 54–56).

Officer Sanchez told Mr. Wiley that efforts would be made to obtain a court order for the medical examinations and that they would wait in the public area until one was obtained. (Tr. 56–58). A number of government agents were called to attempt to obtain such order. (Tr. 57).

Approximately forty-five minutes elapsed and Mr. Wiley displayed his impatience with the delay; he apparently made some statements about how he was always harassed when he came through Customs and that he never had anything on him. (Tr. 58–59, 138). Around this time DEA agents and Officer Viccica came into the area and informed Mr. Wiley of their attempts to get a court order. Mr. Wiley again expressed concern over the delay and either spontaneously offered his consent to the medical procedures if it would expedite matters or gave his consent when asked to do so by the DEA agents. (Tr. 59, 138). In either event, he then signed a consent form agree-

**2.** Obviously the officers suspected that his answer was false because of the computer check noted in note 1, *supra*. They later learned that indeed it was false when another individual who was also detained by Customs stated that he was travelling with Messrs. Wiley and Lee. (Tr. 54).

ing to undergo such examinations and the Customs officials transported him to the medical facility, arriving there at approximately 6:35 PM. (Tr. 59–60, 65–66, 138–141).

When they had finished with preliminary paperwork, Mr. Wiley told Dr. Woroch that he was an epileptic and that therefore he could not have an X-ray taken. Dr. Woroch assured him that this was not so (Tr. 67) and an X-ray was taken which revealed to Dr. Woroch that there were foreign objects in Mr. Wiley's digestive system. (Tr. 68, 145, 402–404).

Dr. Woroch then stated that he wished to perform a rectal examination. Apparently Mr. Wiley refused at first but, after some discussion with the doctor and with the Customs officers who told him that if the doctor was satisfied that there was nothing in him he would be free to leave, he consented. (Tr. 68–69). Dr. Woroch began the rectal examination and said he felt something at which point Mr. Wiley began moving his legs up and down and the doctor could not finish the exam. (Tr. 69, 366).

The doctor then directed that an oral laxative be given to Mr. Wiley, who apparently took the same with no objection. (Tr. 70, 368). On his first bowel movement nothing suspicious was expelled. The agents, however, did not release Mr. Wiley at this point and the doctor suggested another rectal examination. (Tr. 70). Mr. Wiley again refused but after some discussion with the doctor and the Customs officers, who again indicated that if the doctor was satisfied there was nothing suspicious inside of Mr. Wiley, he could leave, Mr. Wiley once again consented. (Tr. 70–71, 371). It is important to note that the doctor testified that a rectal examination cannot be performed without the patient's consent. (Tr. 369).[3] During this second probe, Dr. Woroch removed a condom filled with a narcotic. With this turn of events, Mr. Wiley voluntarily took another laxative and

an enema which quickly produced a number of additional packets of narcotics. (Tr. 70–71). At this juncture, Mr. Wiley was read his rights and placed under arrest. (Tr. 71).

Following their arrests, Messrs. Wiley and Lee were indicted. They have now moved to suppress all of the physical evidence produced by the medical examinations and the various searches.

## DISCUSSION

■ That routine border searches do not violate the Fourth Amendment's proscription against unreasonable searches is well established. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *United States v. Moody*, 649 F.2d 124 (2d Cir. 1981); *United States v. Nieves*, 609 F.2d 642 (2d Cir. 1979), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980). Thus, the various searches of Messrs. Wiley's and Lee's luggage need no justification other than the fact that they occurred at the border. The strip searches and the medical examinations, however, are governed by different standards.

■ In this type of case, where the Customs officials proceeded from the "less intrusive to the more intrusive" form of search, *see United States v. Afanador*, 567 F.2d 1325 (5th Cir. 1978), *see also People v. Seymour*, 80 Ill.App.3d 221, 35 Ill.Dec. 241, 398 N.E.2d 1191 (1979), the "reasonableness of each search is determined by weighing the warranted suspicion of the border official against the offensiveness of the intrusion." *United States v. Asbury*, 586 F.2d 973, 976 (2d Cir. 1980). A strip search of the type conducted by the Customs officials in this case requires that those officials have a "reasonable suspicion" that Messrs. Wiley and Lee were attempting to smuggle contraband into the country. *United States v. Moody, supra*, at 127; *United States v.*

---

**3.** "[I]t's impossible to do a rectal without anyone's consent." (Tr. 369). Even if this statement is not absolutely true, i. e., that a person could be physically restrained and then a rectal performed, we believe that the doctor, because of his testimony and his insistence that consent forms be present as part of the medical record, would never perform a rectal or any other medical examination without consent of the patient.

*Asbury, supra,* at 976. What constitutes a "reasonable suspicion" varies from case to case and many factors may be taken into account. *See United States v. Asbury, supra,* at 976–977 (listing twelve such factors).

■ In the case of Mr. Wiley, a number of factors existed upon which the Customs officers could have based a reasonable suspicion, namely:

(1) The fact that he had made reservations at the same time for the same places as Ms. Mowitz and Ms. Moseman, who were caught attempting to smuggle narcotics into the country just two days prior to Mr. Wiley's arrival.

(2) The fact that he was returning from a trip to a country known as a source of narcotics, i. e., Pakistan.

(3) The fact that he had made a number of trips to the Middle East.

(4) The fact that he had been previously arrested for attempted smuggling.

(5) The fact that he was known, or at least suspected, to have been travelling with others and lied to the Customs officials when he told them he was travelling alone.

(6) The fact that he was believed to have lied to the Customs officials about his acquaintance with Ms. Mowitz and Ms. Moseman.

This series of factors undoubtedly constitutes reasonable suspicion sufficient to justify a strip search of Mr. Wiley. *See United States v. Asbury, supra,* at 976–977 (factors numbered (4), (6), (10) and (12)).

[7] In Mr. Lee's case, the Customs officers' suspicions were based upon the following facts:

(1) That he too made reservations at the same time and for the same place as Ms. Mowitz and Ms. Moseman.

(2) That he too was returning from a trip to a source country for narcotics.

(3) That he had made at least one other trip to the Middle East and another to Peru, another known source country.

(4) That he apparently was travelling with Mr. Wiley, as indicated by the consecutively numbered luggage tags, who had been previously arrested for attempting to smuggle drugs into the United States.

(5) That he reacted oddly when Inspector McDonald questioned him about his trip to Pakistan.

(6) That he voluntarily and spontaneously stated that he suffered from hemorrhoids when he entered into the search room with the two Customs Inspectors.

These facts also clearly constitute sufficient evidence on which to base a reasonable suspicion and thereby justify a strip search of Mr. Lee. *See United States v. Asbury, supra,* at 976–977 (factors numbered (1), (2), (6) and (10)).

■ The body cavity searches of Messrs. Lee and Wiley normally would be judged by a different standard than that used to determine the validity of a strip search because of the more offensive nature of the intrusion. *See United States v. Asbury, supra,* at 976 and 976 n. 4. The government urges us to uphold the search on the basis that there was "sufficient evidence" to suspect that Messrs. Wiley and Lee were carrying drugs internally. What standard of review it urges us to use is not so clear. The defendants, for their part, argue that body cavity searches are *per se* violations of the Fourth Amendment unless a warrant is obtained beforehand. *See United States v. Cameron,* 538 F.2d 254 (9th Cir. 1970). Alternatively they argue that their consent was not voluntarily given and that the searches should be invalidated because the agents overbore their respective wills.

■ While this Court believes that there was probable cause to perform the body cavity searches and that there may even have been a duty on the part of the government to protect Messrs. Wiley and Lee from themselves given the almost fatal poisoning of Ms. Mowitz only a few hours before, we do not at this time believe that we need consider the appropriate standard to be used in judging warrantless body cavi-

ty searches. Rather, because we find both Mr. Wiley and Mr. Lee to have voluntarily consented to the medical examinations, we uphold the searches on that basis and need not reach alternative grounds, for it seems obvious to this Court that any search, even a body cavity search, can be done on consent. *See United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

That Messrs. Wiley and Lee both signed consent forms is uncontested. That they both signed without coercion is obvious from the facts discussed above: Mr. Lee's consent was forthcoming immediately after he was asked; Mr. Wiley's consent was given after he grew impatient with waiting for a court order. However, the mere fact that they signed the consent form does not validate all or any of the rectal examinations for their consent could have been withdrawn.

We do not doubt that Messrs. Wiley and Lee were concerned about the examinations they were being asked to undergo; moreover, we do not doubt that they voiced this concern a number of times during the course of the evening of the 23d of January. However, the testimony of the Customs officers and the doctor, in particular, indicate to this Court's satisfaction that the defendants consented to each and every examination and medical procedure.

The evidence is rather overwhelming that Mr. Lee consented quite voluntarily. He signed the consent form without hesitation; he submitted to the X-ray and first rectal examinations with no protest; finally he took a laxative with no prompting at all. The second rectal he did, at first, object to but, when told of the danger of carrying drugs internally by the doctor, he did agree to undergo a second probe. Perhaps the most telling point about Mr. Lee's consent is the fact that he was asked to take an enema, that he refused and asked to speak to an attorney, and that all examinations of him stopped at that point. To this Court, such respect for his rights indicates two

things: that Mr. Lee knew what he was doing at the time of the examination and that the Customs officers and the doctor did not attempt to override his free will. The fact that the doctor told Mr. Lee of the dangers of carrying drugs internally does not indicate coercion, rather, it indicates a responsible attitude toward the health and safety of a patient under a doctor's care.

Furthermore, Mr. Lee's invocation of his right to call an attorney does not automatically invalidate any of the examinations which took place after that invocation. First, it is clear that Mr. Lee, given the opportunity to make his call, freely chose not to do so. Second, the record reveals that Mr. Lee, while perhaps he did not himself initiate the continuation of the examinations, did indicate a willingness to cooperate, which cooperation was given voluntarily and freely.

Finally, we note the distinction between the instant case and the recent Supreme Court opinion in *Edwards v. Arizona,* —— U.S. ——, 101 S.Ct. 1880, 68 L.Ed.2d 378, 29 Crim.Law Rptr. 3037 (1981). In that case the Supreme Court noted that once a suspect who is being interrogated invokes his right to counsel, all questioning and examination must halt and may not resume unless the suspect himself initiates the continuation. Specifically, the Court said that "it is inconsistent with *Miranda* and its progeny for the authorities, *at their instance,* to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Id.* ——, 101 S.Ct. at 1885 at 3039. The Court was extremely careful to distinguish between the *Miranda* rights, so to speak, of a suspect and his Fourth Amendment rights: "*Schneckloth* [case governing waiver of Fourth Amendment rights] does not control the issue presented in this case." *Id.*

What this case impliedly holds is that it is perfectly proper for the authorities to initiate inquiry into possible waiver of a suspect's Fourth Amendment rights even after he has invoked his right to counsel.

In the case at bar there is no question but that Mr. Lee withdrew his request for counsel and consented to a further medical examination, knowingly, intelligently and voluntarily. *Schneckloth* in our view requires no more.

As for Mr. Wiley's claims that his consent was not given or was involuntary, the evidence is to the contrary. When he first declined to sign a consent form, the Customs officers did not force him or coerce him to do so. They took him to a public area to await the procurement of a court order authorizing the search. Only when impatience set in, did Mr. Wiley offer his consent to "speed things up." His reluctance to be subjected to an X-ray exam because of his epilepsy is not withdrawal of consent but rather concern about the procedure. Once he was assured by the doctor that X-rays do not endanger an epileptic, he proceeded willingly to have the examination done.

Mr. Wiley's consents to undergo the two rectal examinations were also voluntary and well-considered decisions, just as was his agreement to sign the consent form and to be subject to X-ray exams. He weighed the benefits and the detriments, particularly the fact that if the doctor was satisfied that there was nothing there he could leave, and consented. The fact that he wiggled and moved his legs during the first rectal *after* the doctor said he felt something does not indicate hesitancy or lack of consent, rather it indicates an attempt to hide what he had already given his consent to search for in the hope that nothing would be found and that he would be free to leave.

The most telling point, however, is the statement of Dr. Woroch to the effect that he could not and would not perform a rectal examination without a properly signed consent form and a willing patient. (Tr. 369). *See* note 3 *infra*. We fully credit the testimony of the doctor, which testimony further bolsters the government's contentions and the great weight of the evidence, that consent was freely and voluntarily given.

Consequently, on the basis of the foregoing, defendants' motions to suppress physi-

cal evidence produced by the various medical examinations must be, and hereby are, denied.

SO ORDERED.