Marlin E. JONES, Appellant,

v.

Douglas L. EDWARDS, S.S. (Scott) Gilster; Julian Jarvis; Robert Dawson; Danny R. Kramer; Gordon D. Gilster, Sheriff of Lincoln County, Nebraska; and Lincoln County, Nebraska, Appellees.

The City of North Platte, a Nebraska Municipal Corporation; Ronald Arnold; Hubert Klingsporn, individually and as Deputy Sheriffs of Lincoln County, Nebraska; Martin J. Gutschenritter, individually and as Chief of Police of North Platte, Nebraska Police Department; Billy J. Lloyd; Rick M. Ryan, individually and as Police Officers of the City of North Platte, Nebraska.

No. 84–2569.

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1985.

Decided Aug. 20, 1985.

Beverly Evans Grenier, Lincoln, Neb., for appellant.

Frank E. Piccolo, North Platte, Neb., for appellee.

Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

HEANEY, Circuit Judge.

Marlin E. Jones appeals from an adverse jury verdict in his suit under 42 U.S.C. § 1983 for alleged civil rights violations by sheriffs, police officers, and jail personnel in North Platte, Nebraska. For reversal, Jones argues that the district court erred in failing to grant his motion for judgment notwithstanding the verdict, in admitting certain prejudicial testimony, and in instructing the jury improperly. Because we find that the district court should have granted Jones's motion for judgment not-

withstanding the verdict, we need not consider his other contentions.

At 7:00 a.m. on April 30, 1981, a North Platte, Nebraska animal control officer spotted a dog wandering at large. The officer lived in the neighborhood and recognized the dog as Jones's dog Sam, from previous violations; accordingly, when Sam entered Jones's garage, the officer filled out a summons and complaint for Jones, citing him for Sam's apparent violation of the local leash law. When the animal control officer knocked at Jones's door and asked for Jones's identification to complete the summons and complaint, Jones refused to sign the complaint and slammed the door after verbally abusing the officer. The officer radioed for police assistance; the assisting officer accompanied the animal control officer to the door where the two explained to Jones that his signature was not an admission of guilt, but simply a promise to appear in court. Again Jones was abusive and uncooperative, and slammed the door on the officers after threatening them with suit.

The officers consulted their superiors, filled out their reports, and presented the matter to the county attorney. The county attorney reviewed the information, and in following what is apparently regular procedure when citizens decline to sign appearance bonds, presented an affidavit for an arrest warrant to the county judge, who issued the warrant.

The next morning officers served Jones with the warrant between 7:00 and 7:45 a.m. Jones appeared at the door wearing only his trousers; when he read the warrant he became vulgar and abusive again. After arresting him for failure to sign the summons, officers accompanied Jones upstairs for "security reasons" while he dressed and went to the bathroom. Without further searching and without handcuffs, he was then taken to the county jail where he was charged with allowing the dog to run at large and with failure to license the dog.

On the way to and inside the jail, Jones became loud and abusive and, as his booking procedure progressed, he grew increasingly profane and waved his arms about. Witnesses agreed that although Jones was angry, he made no attempt to abuse any officer physically. As a final step in the booking procedure, jail officials performed a non-contact visual strip search of Jones; one jailer stepped with Jones (who was nude) into a sheltered alcove[1] and visually inspected Jones's anal and genital area. After the search, Jones was permitted to dress and he waited in a minimum security cell until a friend posted his bail.

**DISCUSSION.**

 In reviewing a denial of a motion for judgment notwithstanding the verdict, we view the evidence in the light most favorable to the non-moving party. *Lackawanna Leather Co. v. Martin & Stewart, Ltd.*, 730 F.2d 1197, 1200 (8th Cir.1984). In viewing the evidence in this manner, we

> (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*Id.*, citing *Dace v. ACF Industries, Inc.*, 722 F.2d 374, 375 (8th Cir.1983).

Initially, we turn to the legal standard governing suspects' fourth amendment rights during strip searches or body cavity searches. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court considered whether pretrial detainees in New York's federal Metropolitan Correctional Center were protected from such searches by the fourth amendment. Although in the circumstances of that case the Supreme Court approved strip searches as reasonable in terms of the fourth amendment, *id.* at 558, 99 S.Ct. at 1884, it also elaborated a two-pronged test to assist courts in determining reasonableness in other cases. The Court held that the fourth amendment's requirement of reasonableness

---

**1.** This alcove was apparently out of sight of others but unprotected ·by a screen or door.

requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. at 1884.

Other courts have applied the *Bell* test in strip search cases and found constitutional violations. In *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1273 (7th Cir.1983), the Seventh Circuit determined that the city violated the fourth amendment by requiring strip searches of women arrested for misdemeanors and held in waiting cells where the searches were undertaken without regard to the charge or reason to suspect that the detainees concealed weapons. That court adopted the *Bell* test and held that "[t]he more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted." *Id.* The Court based its finding of unreasonableness on the absence of "a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed." *Id.*

Similarly, in *Hill v. Bogans,* 735 F.2d 391 (10th Cir.1984), the Tenth Circuit reversed a judgment on the fourth amendment issue which had been decided against a traffic violator who sued over his strip search. Among other factors,[2] the Court considered that Hill was arrested at 7:30 a.m. for a traffic violation on his way to work and that the offense was not associated with weapons or contraband. In reversing and remanding for a determination of damages, the Court relied on reasoning in

*Logan v. Shealy,* 660 F.2d 1007, 1013 (4th Cir.1981): "An indiscriminate strip search policy routinely applied to detainees * * * [for traffic offenses] along with all other detainees cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations."[3]

Most recently, in *John Does 1–100 v. Ninneman,* 612 F.Supp. 1069 (D.Minn. 1985) United States District Judge Edward Devitt conducted a balancing test under *Bell* and concluded that a county sheriff violated the fourth amendment rights of defendants who were strip searched after they were arrested for driving after revocation and for failure to appear at a hearing related to child support.

■ Our review of those and other cases considering the application of the *Bell* test to detainees charged with misdemeanors convinces us that, on the facts of this case, the district court erred in failing to grant Jones's motion for judgment notwithstanding the verdict. Under the first prong of the *Bell* test (the need for the search), we note that Jones was arrested for failing to sign a summons and complaint arising from a leash law violation—hardly the sort of crime to inspire officers with the fear of introducing weapons or contraband into the holding cell. In addition, officers had no other reason to suspect Jones was harboring these items: he was arrested early in the morning at his home and was not suspected of other crimes. Officers were with him every moment after they read him the warrant; they watched him dress and go to the bathroom, thereby eliminating any chance that he might have secreted a weapon on his person. Moreover, although the record suggests that Jones was uncooperative with officers, he was not charged with resisting arrest or with any sort of public

---

**2.** The Court also considered that Hill was intermingled with the general jail population, that the search was a quick glance rather than a careful examination, and that the search was conducted in a semi-public area. *Hill,* 735 F.2d at 394.

**3.** In *Logan,* a strip search of a woman charged with driving while intoxicated was "conclusively shown to be unconstitutional" under the *Bell*

test. *Logan,* 660 F.2d at 1013. The Court based its reasoning on the fact that Logan was not intermingled with the general jail population, that her offense was not associated with weapons or contraband, and that she had not been subjected to a pat-down search. *Id.* The case was reversed and remanded for a determination of proper damages by a jury.

misconduct which might justify a more intrusive search. We also note that neither the officers nor the jailers attempted a less intrusive pat-down search, which would have detected the proscribed items they sought without infringing Jones's constitutional protections. Thus, we find that the strip search was unjustified.

The second prong of the *Bell* test—the invasion of personal rights—also weighs in Jones's favor. The scope of the particular invasion was broad: Jones was nude and forced to display himself to the visual inspection of a stranger. Although the manner in which the search was conducted was not brutal, it was intrusive, depersonalizing, and distasteful for Jones to be peremptorily subjected to this kind of search by a stranger in the alcove of the hallway. Finally, although the location of the search did not expose Jones to the scrutiny of other jailers or passersby, this degree of privacy seems to have been entirely fortuitous; we suggest that where legitimate security concerns justify this kind of search, jail officials should take precautions to insure that the detainee's privacy is protected from exposure to others unconnected to the search. *See* Colo.Rev.Stat. § 16-3-405(3) ("Any strip search * * *

shall be performed * * * on premises where the search cannot be observed by persons not physically conducting the search.").

Although we recognize that the security of detention facilities is an important concern of correction officials who are, in part, reponsible for the safety of their charges, we also recognize that security cannot justify the blanket deprivation of rights of the kind incurred here.[4] Accordingly, we find that the district court erred in failing to grant Jones's motion for judgment notwithstanding the verdict, and we remand for determination of the proper damages to remedy this constitutional deprivation. Because we find no suggestion of evil motive or intent nor of reckless or callous indifferences to the federally protected rights of others, *see Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983), we decline to allow any award of punitive damages in this case and limit the district court's determination to the proper compensatory damages.

---

4. Jones suggests that the district court's instructions to the jury entitled "Affirmative Defense—Good Faith" were inappropriate. He argues that, by referring to the appellees' subjective knowledge or belief, the district court departed from recent Supreme Court decisions regarding qualified immunity. We agree and we conclude that appellees are not protected by qualified immunity in the circumstances of this case.

In *Davis v. Scherer*, — U.S. —, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), the Supreme Court declared that:

> Under Harlow, officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Whether an official may prevail in his qualified immunity defense depends upon the "objective reasonableness of [his] conduct as measured by reference to clearly established law." No other "circumstances" are relevant to the issue of qualified immunity.

*Id.* — U.S. at —, 104 S.Ct. at 3018, 82 L.Ed.2d at 147 (citations and footnote omitted).

We hold that the fourth amendment's protection against the kind of search of which Jones

complains was well-established at the time his search took place. Aside from the wording of the fourth amendment itself and the many decisions of the Supreme Court limiting the authority of officials to search suspects, the Seventh Circuit had already affirmed a district court's disapproval of a strip search of a motorist unsuspected of harboring weapons or contraband. *Tinetti v. Wittke*, 479 F.Supp. 486 (E.D.Wis. 1979), *aff'd*, 620 F.2d 160 (1980) (per curiam). *See also Morales v. United States*, 406 F.2d 1298, 1299 (9th Cir.1969) (vaginal search at border was improper absent "clear indication appellant was possessing narcotics"); *Huguez v. United States*, 406 F.2d 366, 378–79 (9th Cir.1968) (intrusive rectal search at border was improper absent "clear indication" or "plain suggestion" that Huguez carried narcotics in his rectal cavity); *People v. Seymour*, 398 N.E.2d 1191, 1197, 80 Ill.App.3d 221, 35 Ill.Dec. 241 (1979) (strip search invalidated under Illinois' constitutional provision similar to fourth amendment). *See also generally* P. Schuldiver, *Visual Rape: A Look at the Dubious Legality of Strip Searches*, 13 John Marshall L.Rev. 273 (1980).