(Slip Opinion) OCTOBER TERM, 2011 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FLORENCE *v.* BOARD OF CHOSEN FREEHOLDERS OF COUNTY OF BURLINGTON ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 10–945.   Argued October 12, 2011—Decided April 2, 2012

Petitioner was arrested during a traffic stop by a New Jersey state trooper who checked a statewide computer database and found a bench warrant issued for petitioner's arrest after he failed to appear at a hearing to enforce a fine.  He was initially detained in the Burlington County Detention Center and later in the Essex County Correctional Facility, but was released once it was determined that the fine had been paid.  At the first jail, petitioner, like every incoming detainee, had to shower with a delousing agent and was checked for scars, marks, gang tattoos, and contraband as he disrobed.  Petitioner claims that he also had to open his mouth, lift his tongue, hold out his arms, turn around, and lift his genitals.  At the second jail, petitioner, like other arriving detainees, had to remove his clothing while an officer looked for body markings, wounds, and contraband; had an officer look at his ears, nose, mouth, hair, scalp, fingers, hands, armpits, and other body openings; had a mandatory shower; and had his clothes examined.  Petitioner claims that he was also required to lift his genitals, turn around, and cough while squatting.  He filed a 42 U. S. C. §1983 action in the Federal District Court against the government entities that ran the jails and other defendants, alleging Fourth and Fourteenth Amendment violations, and arguing that persons arrested for minor offenses cannot be subjected to invasive searches unless prison officials have reason to suspect concealment of weapons, drugs, or other contraband.  The court granted him summary judgment, ruling that "strip-searching" nonindictable offenders without reasonable suspicion violates the Fourth Amendment.  The Third Circuit reversed.

*Held:* The judgment is affirmed.

621 F. 3d 296, affirmed.

JUSTICE KENNEDY delivered the opinion of the Court, except as to Part IV, concluding that the search procedures at the county jails struck a reasonable balance between inmate privacy and the needs of the institutions, and thus the Fourth and Fourteenth Amendments do not require adoption of the framework and rules petitioner proposes. Pp. 5−18, 19.

(a) Maintaining safety and order at detention centers requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to problems. A regulation impinging on an inmate's constitutional rights must be upheld "if it is reasonably related to legitimate penological interests." *Turner* v. *Safley*, 482 U. S. 78, 89. This Court, in *Bell* v. *Wolfish*, 441 U. S. 520, 558, upheld a rule requiring pretrial detainees in federal correctional facilities "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution[s]," deferring to the judgment of correctional officials that the inspections served not only to discover but also to deter the smuggling of weapons, drugs, and other prohibited items. In *Block* v. *Rutherford*, 468 U. S. 576, 586−587, the Court upheld a general ban on contact visits in a county jail, noting the smuggling threat posed by such visits and the difficulty of carving out exceptions for certain detainees. The Court, in *Hudson* v. *Palmer,* 468 U. S. 517, 522−523, also recognized that deterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions when it upheld the constitutionality of random searches of inmate lockers and cells even without suspicion that an inmate is concealing a prohibited item. These cases establish that correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities, and that "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters," *Block, supra,* at 584–585.

Persons arrested for minor offenses may be among the detainees to be processed at jails. See *Atwater* v. *Lago Vista*, 532 U. S. 318, 354. Pp. 5−9.

(b) The question here is whether undoubted security imperatives involved in jail supervision override the assertion that some detainees must be exempt from the invasive search procedures at issue absent reasonable suspicion of a concealed weapon or other contraband. Correctional officials have a significant interest in conducting a thorough search as a standard part of the intake process. The admission of new inmates creates risks for staff, the existing detainee popula-

tion, and the new detainees themselves. Officials therefore must screen for contagious infections and for wounds or injuries requiring immediate medical attention. It may be difficult to identify and treat medical problems until detainees remove their clothes for a visual inspection. Jails and prisons also face potential gang violence, giving them reasonable justification for a visual inspection of detainees for signs of gang affiliation as part of the intake process. Additionally, correctional officials have to detect weapons, drugs, alcohol, and other prohibited items new detainees may possess. Drugs can make inmates aggressive toward officers or each other, and drug trading can lead to violent confrontations. Contraband has value in a jail's culture and underground economy, and competition for scarce goods can lead to violence, extortion, and disorder. Pp. 9−13.

(c) Petitioner's proposal—that new detainees not arrested for serious crimes or for offenses involving weapons or drugs be exempt from invasive searches unless they give officers a particular reason to suspect them of hiding contraband—is unworkable. The seriousness of an offense is a poor predictor of who has contraband, and it would be difficult to determine whether individual detainees fall within the proposed exemption. Even persons arrested for a minor offense may be coerced by others into concealing contraband. Exempting people arrested for minor offenses from a standard search protocol thus may put them at greater risk and result in more contraband being brought into the detention facility.

It also may be difficult to classify inmates by their current and prior offenses before the intake search. Jail officials know little at the outset about an arrestee, who may be carrying a false ID or lie about his identity. The officers conducting an initial search often do not have access to criminal history records. And those records can be inaccurate or incomplete. Even with accurate information, officers would encounter serious implementation difficulties. They would be required to determine quickly whether any underlying offenses were serious enough to authorize the more invasive search protocol. Other possible classifications based on characteristics of individual detainees also might prove to be unworkable or even give rise to charges of discriminatory application. To avoid liability, officers might be inclined not to conduct a thorough search in any close case, thus creating unnecessary risk for the entire jail population. While the restrictions petitioner suggests would limit the intrusion on the privacy of some detainees, it would be at the risk of increased danger to everyone in the facility, including the less serious offenders. The Fourth and Fourteenth Amendments do not require adoption of the proposed framework. Pp. 13−18, 19.

KENNEDY, J., delivered the opinion of the Court, except as to Part IV. ROBERTS, C. J., and SCALIA and ALITO, JJ., joined that opinion in full, and THOMAS, J., joined as to all but Part IV.  ROBERTS, C. J., and ALITO, J., filed concurring opinions.  BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–945

ALBERT W. FLORENCE, PETITIONER *v.* BOARD OF
CHOSEN FREEHOLDERS OF THE COUNTY OF
BURLINGTON ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[April 2, 2012]

JUSTICE KENNEDY delivered the opinion of the Court,
except as to Part IV.*

Correctional officials have a legitimate interest, indeed
a responsibility, to ensure that jails are not made less
secure by reason of what new detainees may carry in on
their bodies.  Facility personnel, other inmates, and the
new detainee himself or herself may be in danger if these
threats are introduced into the jail population.  This case
presents the question of what rules, or limitations, the
Constitution imposes on searches of arrested persons who
are to be held in jail while their cases are being processed.
The term "jail" is used here in a broad sense to include
prisons and other detention facilities.  The specific
measures being challenged will be described in more
detail; but, in broad terms, the controversy concerns
whether every detainee who will be admitted to the gen-
eral population may be required to undergo a close visual
inspection while undressed.

The case turns in part on the extent to which this Court

——————

*JUSTICE THOMAS joins all but Part IV of this opinion.

has sufficient expertise and information in the record to mandate, under the Constitution, the specific restrictions and limitations sought by those who challenge the visual search procedures at issue. In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security. That necessary showing has not been made in this case.

I

In 1998, seven years before the incidents at issue, petitioner Albert Florence was arrested after fleeing from police officers in Essex County, New Jersey. He was charged with obstruction of justice and use of a deadly weapon. Petitioner entered a plea of guilty to two lesser offenses and was sentenced to pay a fine in monthly installments. In 2003, after he fell behind on his payments and failed to appear at an enforcement hearing, a bench warrant was issued for his arrest. He paid the outstanding balance less than a week later; but, for some unexplained reason, the warrant remained in a statewide computer database.

Two years later, in Burlington County, New Jersey, petitioner and his wife were stopped in their automobile by a state trooper. Based on the outstanding warrant in the computer system, the officer arrested petitioner and took him to the Burlington County Detention Center. He was held there for six days and then was transferred to the Essex County Correctional Facility. It is not the arrest or confinement but the search process at each jail that gives rise to the claims before the Court.

Burlington County jail procedures required every arrestee to shower with a delousing agent. Officers would check arrestees for scars, marks, gang tattoos, and contraband as they disrobed. App. to Pet. for Cert. 53a–56a.

Petitioner claims he was also instructed to open his mouth, lift his tongue, hold out his arms, turn around, and lift his genitals. (It is not clear whether this last step was part of the normal practice. See *ibid.*) Petitioner shared a cell with at least one other person and interacted with other inmates following his admission to the jail. Tr. of Oral Arg. 17.

The Essex County Correctional Facility, where petitioner was taken after six days, is the largest county jail in New Jersey. App. 70a. It admits more than 25,000 inmates each year and houses about 1,000 gang members at any given time. When petitioner was transferred there, all arriving detainees passed through a metal detector and waited in a group holding cell for a more thorough search. When they left the holding cell, they were instructed to remove their clothing while an officer looked for body markings, wounds, and contraband. Apparently without touching the detainees, an officer looked at their ears, nose, mouth, hair, scalp, fingers, hands, arms, armpits, and other body openings. *Id.*, at 57a–59a; App. to Pet. for Cert. 137a–144a. This policy applied regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor, or criminal history. Petitioner alleges he was required to lift his genitals, turn around, and cough in a squatting position as part of the process. After a mandatory shower, during which his clothes were inspected, petitioner was admitted to the facility. App. 3a–4a, 52a, 258a. He was released the next day, when the charges against him were dismissed.

Petitioner sued the governmental entities that operated the jails, one of the wardens, and certain other defendants. The suit was commenced in the United States District Court for the District of New Jersey. Seeking relief under 42 U. S. C. §1983 for violations of his Fourth and Fourteenth Amendment rights, petitioner maintained that persons arrested for a minor offense could not be required

to remove their clothing and expose the most private areas of their bodies to close visual inspection as a routine part of the intake process.  Rather, he contended, officials could conduct this kind of search only if they had reason to suspect a particular inmate of concealing a weapon, drugs, or other contraband.  The District Court certified a class of individuals who were charged with a nonindictable offense under New Jersey law, processed at either the Burlington County or Essex County jail, and directed to strip naked even though an officer had not articulated any reasonable suspicion they were concealing contraband.

After discovery, the court granted petitioner's motion for summary judgment on the unlawful search claim.  It concluded that any policy of "strip searching" nonindictable offenders without reasonable suspicion violated the Fourth Amendment.  A divided panel of the United States Court of Appeals for the Third Circuit reversed, holding that the procedures described by the District Court struck a reasonable balance between inmate privacy and the security needs of the two jails.  621 F. 3d 296 (2010).  The case proceeds on the understanding that the officers searched detainees prior to their admission to the general population, as the Court of Appeals seems to have assumed.  See *id.,* at 298, 311.  Petitioner has not argued this factual premise is incorrect.

The opinions in earlier proceedings, the briefs on file, and some cases of this Court refer to a "strip search."  The term is imprecise.  It may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to

cough in a squatting position. In the instant case, the term does not include any touching of unclothed areas by the inspecting officer. There are no allegations that the detainees here were touched in any way as part of the searches.

The Federal Courts of Appeals have come to differing conclusions as to whether the Fourth Amendment requires correctional officials to exempt some detainees who will be admitted to a jail's general population from the searches here at issue. This Court granted certiorari to address the question. 563 U. S. ___ (2011).

## II

The difficulties of operating a detention center must not be underestimated by the courts. *Turner* v. *Safley*, 482 U. S. 78, 84–85 (1987). Jails (in the stricter sense of the term, excluding prison facilities) admit more than 13 million inmates a year. See, *e.g.,* Dept. of Justice, Bureau of Justice Statistics, T. Minton, Jail Inmates at Midyear 2010—Statistical Tables 2 (2011). The largest facilities process hundreds of people every day; smaller jails may be crowded on weekend nights, after a large police operation, or because of detainees arriving from other jurisdictions. Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face. The Court has confirmed the importance of deference to correctional officials and explained that a regulation impinging on an inmate's constitutional rights must be upheld "if it is reasonably related to legitimate penological interests." *Turner, supra,* at 89; see *Overton* v. *Bazzetta*, 539 U. S. 126, 131–132 (2003). But see *Johnson* v. *California*, 543 U. S. 499, 510–511 (2005) (applying strict scrutiny to racial classifications).

The Court's opinion in *Bell* v. *Wolfish*, 441 U. S. 520 (1979), is the starting point for understanding how this

framework applies to Fourth Amendment challenges. That case addressed a rule requiring pretrial detainees in any correctional facility run by the Federal Bureau of Prisons "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." *Id.*, at 558. Inmates at the federal Metropolitan Correctional Center in New York City argued there was no security justification for these searches. Officers searched guests before they entered the visiting room, and the inmates were under constant surveillance during the visit. *Id.,* at 577–578 (Marshall, J., dissenting). There had been but one instance in which an inmate attempted to sneak contraband back into the facility. See *id.,* at 559 (majority opinion). The Court nonetheless upheld the search policy. It deferred to the judgment of correctional officials that the inspections served not only to discover but also to deter the smuggling of weapons, drugs, and other prohibited items inside. *Id.*, at 558. The Court explained that there is no mechanical way to determine whether intrusions on an inmate's privacy are reasonable. *Id.*, at 559. The need for a particular search must be balanced against the resulting invasion of personal rights. *Ibid.*

Policies designed to keep contraband out of jails and prisons have been upheld in cases decided since *Bell.* In *Block* v. *Rutherford*, 468 U. S. 576 (1984), for example, the Court concluded that the Los Angeles County Jail could ban all contact visits because of the threat they posed:

> "They open the institution to the introduction of drugs, weapons, and other contraband. Visitors can easily conceal guns, knives, drugs, or other contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observers. And these items can readily be slipped from the clothing of an innocent child, or transferred by other visitors

permitted close contact with inmates." *Id.,* at 586.

There were "many justifications" for imposing a general ban rather than trying to carve out exceptions for certain detainees. *Id.,* at 587. Among other problems, it would be "a difficult if not impossible task" to identify "inmates who have propensities for violence, escape, or drug smuggling." *Ibid.* This was made "even more difficult by the brevity of detention and the constantly changing nature of the inmate population." *Ibid.*

The Court has also recognized that deterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions. In *Hudson* v. *Palmer*, 468 U. S. 517 (1984), it addressed the question of whether prison officials could perform random searches of inmate lockers and cells even without reason to suspect a particular individual of concealing a prohibited item. *Id.,* at 522–523. The Court upheld the constitutionality of the practice, recognizing that "'[f]or one to advocate that prison searches must be conducted only pursuant to an enunciated general policy or when suspicion is directed at a particular inmate is to ignore the realities of prison operation.'" *Id.,* at 529 (quoting *Marrero* v. *Commonwealth*, 222 Va. 754, 757, 284 S. E. 2d 809, 811 (1981)). Inmates would adapt to any pattern or loopholes they discovered in the search protocol and then undermine the security of the institution. 468 U. S., at 529.

These cases establish that correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities. See *Bell*, 441 U. S.*,* at 546 ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of retained constitutional rights of both convicted prisoners and pretrial detainees"). The task of determining whether a policy is reasonably related to legitimate security inter-

ests is "peculiarly within the province and professional expertise of corrections officials." *Id.,* at 548. This Court has repeated the admonition that, "'in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters.'" *Block, supra,* at 584–585; *Bell*, *supra,* at 548.

In many jails officials seek to improve security by requiring some kind of strip search of everyone who is to be detained. These procedures have been used in different places throughout the country, from Cranston, Rhode Island, to Sapulpa, Oklahoma, to Idaho Falls, Idaho. See *Roberts* v. *Rhode Island*, 239 F. 3d 107, 108–109 (CA1 2001); *Chapman* v. *Nichols*, 989 F. 2d 393, 394 (CA10 1993); *Giles* v. *Ackerman*, 746 F. 2d 614, 615 (CA9 1984) *(per curiam);* see also, *e.g., Bull* v. *City and Cty. of San Francisco*, 595 F. 3d 964 (CA9 2010) (en banc) (San Francisco, California); *Powell* v. *Barrett*, 541 F. 3d 1298 (CA11 2008) (en banc) (Fulton Cty., Ga.); *Masters* v. *Crouch*, 872 F. 2d 1248, 1251 (CA6 1989) (Jefferson Cty., Ky.); *Weber* v. *Dell*, 804 F. 2d 796, 797–798 (CA2 1986) (Monroe Cty., N. Y.); *Stewart* v. *Lubbock Cty.*, 767 F. 2d 153, 154 (CA5 1985) (Lubbock Cty., Tex.).

Persons arrested for minor offenses may be among the detainees processed at these facilities. This is, in part, a consequence of the exercise of state authority that was the subject of *Atwater* v. *Lago Vista*, 532 U. S. 318 (2001). *Atwater* addressed the perhaps more fundamental question of who may be deprived of liberty and taken to jail in the first place. The case involved a woman who was arrested after a police officer noticed neither she nor her children were wearing their seatbelts. The arrestee argued the Fourth Amendment prohibited her custodial arrest without a warrant when an offense could not result in jail time and there was no compelling need for immedi-

ate detention. *Id.,* at 346. The Court held that a Fourth Amendment restriction on this power would put officers in an "almost impossible spot." *Id.,* at 350. Their ability to arrest a suspect would depend in some cases on the precise weight of drugs in his pocket, whether he was a repeat offender, and the scope of what counted as a compelling need to detain someone. *Id.,* at 348–349. The Court rejected the proposition that the Fourth Amendment barred custodial arrests in a set of these cases as a matter of constitutional law. It ruled, based on established principles, that officers may make an arrest based upon probable cause to believe the person has committed a criminal offense in their presence. See *id.,* at 354. The Court stated that "a responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review." *Id.,* at 347.

*Atwater* did not address whether the Constitution imposes special restrictions on the searches of offenders suspected of committing minor offenses once they are taken to jail. Some Federal Courts of Appeals have held that corrections officials may not conduct a strip search of these detainees, even if no touching is involved, absent reasonable suspicion of concealed contraband. 621 F. 3d, at 303–304, and n. 4. The Courts of Appeals to address this issue in the last decade, however, have come to the opposite conclusion. See 621 F. 3d 296 (case below); *Bame* v. *Dillard*, 637 F. 3d 380 (CADC 2011); *Powell*, *supra; Bull*, *supra.* The current case is set against this precedent and governed by the principles announced in *Turner* and *Bell*.

## III

The question here is whether undoubted security imperatives involved in jail supervision override the asser-

tion that some detainees must be exempt from the more invasive search procedures at issue absent reasonable suspicion of a concealed weapon or other contraband. The Court has held that deference must be given to the officials in charge of the jail unless there is "substantial evidence" demonstrating their response to the situation is exaggerated. *Block*, 468 U. S., at 584–585 (internal quotation marks omitted). Petitioner has not met this standard, and the record provides full justifications for the procedures used.

A

Correctional officials have a significant interest in conducting a thorough search as a standard part of the intake process. The admission of inmates creates numerous risks for facility staff, for the existing detainee population, and for a new detainee himself or herself. The danger of introducing lice or contagious infections, for example, is well documented. See, *e.g.,* Deger & Quick, The Enduring Menace of MRSA: Incidence, Treatment, and Prevention in a County Jail, 15 J. Correctional Health Care 174, 174–175, 177–178 (2009); Bick, Infection Control in Jails and Prisons, 45 Healthcare Epidemiology 1047, 1049 (2007). The Federal Bureau of Prisons recommends that staff screen new detainees for these conditions. See Clinical Practice Guidelines, Management of Methicillin-Resistant *Staphylococcus aureus* (MRSA) Infections 2 (2011); Clinical Practice Guidelines, Lice and Scabies Protocol 1 (2011). Persons just arrested may have wounds or other injuries requiring immediate medical attention. It may be difficult to identify and treat these problems until detainees remove their clothes for a visual inspection. See Prison and Jail Administration: Practice and Theory 142 (P. Carlson & G. Garrett eds., 2d ed. 2008) (hereinafter Carlson & Garrett).

Jails and prisons also face grave threats posed by the

increasing number of gang members who go through the intake process. See Brief for Policemen's Benevolent Association, Local 249, et al. as *Amici Curiae* 14 (hereinafter PBA Brief); New Jersey Comm'n of Investigation, Gangland Behind Bars: How and Why Organized Criminal Street Gangs Thrive in New Jersey's Prisons . . . And What Can Be Done About It 10–11 (2009). "Gang rivalries spawn a climate of tension, violence, and coercion." Carlson & Garrett 462. The groups recruit new members by force, engage in assaults against staff, and give other inmates a reason to arm themselves. *Ibid.* Fights among feuding gangs can be deadly, and the officers who must maintain order are put in harm's way. PBA Brief 17. These considerations provide a reasonable basis to justify a visual inspection for certain tattoos and other signs of gang affiliation as part of the intake process. The identification and isolation of gang members before they are admitted protects everyone in the facility. Cf. *Fraise* v. *Terhune*, 283 F. 3d 506, 509–510 (CA3 2002) (Alito, J.) (describing a statewide policy authorizing the identification and isolation of gang members in prison).

Detecting contraband concealed by new detainees, furthermore, is a most serious responsibility. Weapons, drugs, and alcohol all disrupt the safe operation of a jail. Cf. *Hudson*, 468 U. S., at 528 (recognizing "the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband"). Correctional officers have had to confront arrestees concealing knives, scissors, razor blades, glass shards, and other prohibited items on their person, including in their body cavities. See *Bull*, 595 F. 3d, at 967, 969; Brief for New Jersey County Jail Wardens Association as *Amicus Curiae* 17–18 (hereinafter New Jersey Wardens Brief). They have also found crack, heroin, and marijuana. Brief for City and County of San Francisco et al. as *Amici Curiae* 9–11 (hereinafter San Francisco Brief). The use of drugs can embolden inmates

in aggression toward officers or each other; and, even apart from their use, the trade in these substances can lead to violent confrontations. See PBA Brief 11.

There are many other kinds of contraband. The textbook definition of the term covers any unauthorized item. See Prisons: Today and Tomorrow 237 (J. Pollock ed. 1997) ("*Contraband* is any item that is possessed in violation of prison rules. Contraband obviously includes drugs or weapons, but it can also be money, cigarettes, or even some types of clothing"). Everyday items can undermine security if introduced into a detention facility:

> "Lighters and matches are fire and arson risks or potential weapons. Cell phones are used to orchestrate violence and criminality both within and without jailhouse walls. Pills and medications enhance suicide risks. Chewing gum can block locking devices; hairpins can open handcuffs; wigs can conceal drugs and weapons." New Jersey Wardens Brief 8–9.

Something as simple as an overlooked pen can pose a significant danger. Inmates commit more than 10,000 assaults on correctional staff every year and many more among themselves. See Dept. of Justice, Bureau of Justice Statistics, J. Stephan & J. Karberg, Census of State and Federal Correctional Facilities, 2000, p. v (2003).

Contraband creates additional problems because scarce items, including currency, have value in a jail's culture and underground economy. Correctional officials inform us "[t]he competition . . . for such goods begets violence, extortion, and disorder." New Jersey Wardens Brief 2. Gangs exacerbate the problem. They "orchestrate thefts, commit assaults, and approach inmates in packs to take the contraband from the weak." *Id.,* at 9–10. This puts the entire facility, including detainees being held for a brief term for a minor offense, at risk. Gangs do coerce inmates who have access to the outside world, such as

people serving their time on the weekends, to sneak things into the jail. *Id.,* at 10; see, *e.g.,* Pugmire, Vegas Suspect Has Term to Serve, Los Angeles Times, Sept. 23, 2005, p. B1 ("Weekend-only jail sentences are a common punishment for people convicted of nonviolent drug crimes . . ."). These inmates, who might be thought to pose the least risk, have been caught smuggling prohibited items into jail. See New Jersey Wardens Brief 10. Concealing contraband often takes little time and effort. It might be done as an officer approaches a suspect's car or during a brief commotion in a group holding cell. Something small might be tucked or taped under an armpit, behind an ear, between the buttocks, in the instep of a foot, or inside the mouth or some other body cavity.

It is not surprising that correctional officials have sought to perform thorough searches at intake for disease, gang affiliation, and contraband. Jails are often crowded, unsanitary, and dangerous places. There is a substantial interest in preventing any new inmate, either of his own will or as a result of coercion, from putting all who live or work at these institutions at even greater risk when he is admitted to the general population.

## B

Petitioner acknowledges that correctional officials must be allowed to conduct an effective search during the intake process and that this will require at least some detainees to lift their genitals or cough in a squatting position. These procedures, similar to the ones upheld in *Bell*, are designed to uncover contraband that can go undetected by a patdown, metal detector, and other less invasive searches. See Brief for United States as *Amicus Curiae* 23 (hereinafter United States Brief); New Jersey Wardens Brief 19, n. 6. Petitioner maintains there is little benefit to conducting these more invasive steps on a new detainee who has not been arrested for a serious crime or for any

offense involving a weapon or drugs.  In his view these de-
tainees should be exempt from this process unless they
give officers a particular reason to suspect them of hiding
contraband.  It is reasonable, however, for correctional
officials to conclude this standard would be unworkable.
The record provides evidence that the seriousness of an
offense is a poor predictor of who has contraband and
that it would be difficult in practice to determine whether
individual detainees fall within the proposed exemption.

1

People detained for minor offenses can turn out to be
the most devious and dangerous criminals. Cf. *Clements* v.
*Logan*, 454 U. S. 1304, 1305 (1981) (Rehnquist, J., in
chambers) (deputy at a detention center shot by misde-
meanant who had not been strip searched).  Hours after
the Oklahoma City bombing, Timothy McVeigh was
stopped by a state trooper who noticed he was driving
without a license plate.  Johnston, Suspect Won't Answer
Any Questions, N. Y. Times, Apr. 25, 1995, p. A1.  Police
stopped serial killer Joel Rifkin for the same reason.
McQuiston, Confession Used to Portray Rifkin as Method-
ical Killer, N. Y. Times, Apr. 26, 1994, p. B6.  One of
the terrorists involved in the September 11 attacks was
stopped and ticketed for speeding just two days before
hijacking Flight 93.  The Terrorists: Hijacker Got a Speed-
ing Ticket, N. Y. Times, Jan. 8, 2002, p. A12.  Reasonable
correctional officials could conclude these uncertainties
mean they must conduct the same thorough search of
everyone who will be admitted to their facilities.

Experience shows that people arrested for minor of-
fenses have tried to smuggle prohibited items into jail,
sometimes by using their rectal cavities or genitals for the
concealment.  They may have some of the same incentives
as a serious criminal to hide contraband.  A detainee
might risk carrying cash, cigarettes, or a penknife to

survive in jail. Others may make a quick decision to hide unlawful substances to avoid getting in more trouble at the time of their arrest. This record has concrete examples. Officers at the Atlantic County Correctional Facility, for example, discovered that a man arrested for driving under the influence had "2 dime bags of weed, 1 pack of rolling papers, 20 matches, and 5 sleeping pills" taped under his scrotum. Brief for Atlantic County et al. as *Amici Curiae* 36 (internal quotation marks omitted). A person booked on a misdemeanor charge of disorderly conduct in Washington State managed to hide a lighter, tobacco, tattoo needles, and other prohibited items in his rectal cavity. See United States Brief 25, n. 15. San Francisco officials have discovered contraband hidden in body cavities of people arrested for trespassing, public nuisance, and shoplifting. San Francisco Brief 3. There have been similar incidents at jails throughout the country. See United States Brief 25, n. 15.

Even if people arrested for a minor offense do not themselves wish to introduce contraband into a jail, they may be coerced into doing so by others. See New Jersey Wardens Brief 16; cf. *Block*, 468 U. S., at 587 ("It is not unreasonable to assume, for instance, that low security risk detainees would be enlisted to help obtain contraband or weapons by their fellow inmates who are denied contact visits"). This could happen any time detainees are held in the same area, including in a van on the way to the station or in the holding cell of the jail. If, for example, a person arrested and detained for unpaid traffic citations is not subject to the same search as others, this will be well known to other detainees with jail experience. A hardened criminal or gang member can, in just a few minutes, approach the person and coerce him into hiding the fruits of a crime, a weapon, or some other contraband. As an expert in this case explained, "the interaction and mingling between misdemeanants and felons will only increase the

amount of contraband in the facility if the jail can only conduct admission searches on felons." App. 381a. Exempting people arrested for minor offenses from a standard search protocol thus may put them at greater risk and result in more contraband being brought into the detention facility. This is a substantial reason not to mandate the exception petitioner seeks as a matter of constitutional law.

2

It also may be difficult, as a practical matter, to classify inmates by their current and prior offenses before the intake search. Jails can be even more dangerous than prisons because officials there know so little about the people they admit at the outset. See New Jersey Wardens Brief 11–14. An arrestee may be carrying a false ID or lie about his identity. The officers who conduct an initial search often do not have access to criminal history records. See, *e.g.*, App. 235a; New Jersey Wardens Brief 13. And those records can be inaccurate or incomplete. See *Department of Justice* v. *Reporters Comm. for Freedom of Press*, 489 U. S. 749, 752 (1989). Petitioner's rap sheet is an example. It did not reflect his previous arrest for possession of a deadly weapon. Tr. of Oral Arg. 18–19. In the absence of reliable information it would be illogical to require officers to assume the arrestees in front of them do not pose a risk of smuggling something into the facility.

The laborious administration of prisons would become less effective, and likely less fair and evenhanded, were the practical problems inevitable from the rules suggested by petitioner to be imposed as a constitutional mandate. Even if they had accurate information about a detainee's current and prior arrests, officers, under petitioner's proposed regime, would encounter serious implementation difficulties. They would be required, in a few minutes, to determine whether any of the underlying offenses were

serious enough to authorize the more invasive search protocol. Other possible classifications based on characteristics of individual detainees also might prove to be unworkable or even give rise to charges of discriminatory application. Most officers would not be well equipped to make any of these legal determinations during the pressures of the intake process. *Bull*, 595 F. 3d, at 985–987 (Kozinski, C. J., concurring); see also *Welsh* v. *Wisconsin*, 466 U. S. 740, 761–762 (1984) (White, J., dissenting) ("[T]he Court's approach will necessitate a case-by-case evaluation of the seriousness of particular crimes, a difficult task for which officers and courts are poorly equipped"). To avoid liability, officers might be inclined not to conduct a thorough search in any close case, thus creating unnecessary risk for the entire jail population. Cf. *Atwater*, 532 U. S., at 351, and n. 22.

The Court addressed an analogous problem in *Atwater*. The petitioner in that case argued the Fourth Amendment prohibited a warrantless arrest when being convicted of the suspected crime "could not ultimately carry any jail time" and there was "no compelling need for immediate detention." *Id.,* at 346. That rule "promise[d] very little in the way of administrability." *Id.,* at 350. Officers could not be expected to draw the proposed lines on a moment's notice, and the risk of violating the Constitution would have discouraged them from arresting criminals in any questionable circumstances. *Id.,* at 350–351 ("An officer not quite sure the drugs weighed enough to warrant jail time or not quite certain about a suspect's risk of flight would not arrest, even though it could perfectly well turn out that, in fact, the offense called for incarceration and the defendant was long gone on the day of trial"). The Fourth Amendment did not compel this result in *Atwater*. The Court held that officers who have probable cause to believe even a minor criminal offense has been committed in their presence may arrest the offender. See *id.*, at 354.

Individual jurisdictions can of course choose "to impose more restrictive safeguards through statutes limiting warrantless arrests for minor offenders." *Id.,* at 352.

One of the central principles in *Atwater* applies with equal force here. Officers who interact with those suspected of violating the law have an "essential interest in readily administrable rules." *Id.,* at 347; accord, *New York* v. *Belton*, 453 U. S. 454, 458 (1981). The officials in charge of the jails in this case urge the Court to reject any complicated constitutional scheme requiring them to conduct less thorough inspections of some detainees based on their behavior, suspected offense, criminal history, and other factors. They offer significant reasons why the Constitution must not prevent them from conducting the same search on any suspected offender who will be admitted to the general population in their facilities. The restrictions suggested by petitioner would limit the intrusion on the privacy of some detainees but at the risk of increased danger to everyone in the facility, including the less serious offenders themselves.

## IV

This case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees. This describes the circumstances in *Atwater*. See 532 U. S., at 324 ("Officers took Atwater's 'mug shot' and placed her, alone, in a jail cell for about one hour, after which she was taken before a magistrate and released on $310 bond"). The accommodations provided in these situations may diminish the need to conduct some aspects of the searches at issue. Cf. United States Brief 30 (discussing the segregation, and less invasive searches, of individuals held by the Federal Bureau of Prisons for misdemeanors or civil contempt). The circumstances

before the Court, however, do not present the opportunity to consider a narrow exception of the sort JUSTICE ALITO describes, *post,* at 2–3 (concurring opinion), which might restrict whether an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population, may be subjected to the types of searches at issue here.

Petitioner's *amici* raise concerns about instances of officers engaging in intentional humiliation and other abusive practices. See Brief for Sister Bernie Galvin et al. as *Amici Curiae;* see also *Hudson*, 468 U. S., at 528 ("[I]ntentional harassment of even the most hardened criminals cannot be tolerated by a civilized society"); *Bell*, 441 U. S., at 560. There also may be legitimate concerns about the invasiveness of searches that involve the touching of detainees. These issues are not implicated on the facts of this case, however, and it is unnecessary to consider them here.

V

Even assuming all the facts in favor of petitioner, the search procedures at the Burlington County Detention Center and the Essex County Correctional Facility struck a reasonable balance between inmate privacy and the needs of the institutions. The Fourth and Fourteenth Amendments do not require adoption of the framework of rules petitioner proposes.

The judgment of the Court of Appeals for the Third Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–945

_____

ALBERT W. FLORENCE, PETITIONER *v.* BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF BURLINGTON ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[April 2, 2012]

CHIEF JUSTICE ROBERTS, concurring.

I join the opinion of the Court. As with JUSTICE ALITO, however, it is important for me that the Court does not foreclose the possibility of an exception to the rule it announces. JUSTICE KENNEDY explains that the circumstances before it do not afford an opportunity to consider that possibility. *Ante,* at 18–19. Those circumstances include the facts that Florence was detained not for a minor traffic offense but instead pursuant to a warrant for his arrest, and that there was apparently no alternative, if Florence were to be detained, to holding him in the general jail population.

Factual nuances have not played a significant role as this case has been presented to the Court. Both courts below regarded acknowledged factual disputes as "immaterial" to their conflicting dispositions, 621 F. 3d 296, 300 (CA3 2010), and before this Court Florence challenged suspicionless strip searches "no matter what the circumstances." Pet. for Cert. i.

The Court makes a persuasive case for the general applicability of the rule it announces. The Court is nonetheless wise to leave open the possibility of exceptions, to ensure that we "not embarrass the future." *Northwest Airlines, Inc.* v. *Minnesota,* 322 U. S. 292, 300 (1944) (Frankfurter, J.).

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–945

_____

ALBERT W. FLORENCE, PETITIONER *v.* BOARD OF
CHOSEN FREEHOLDERS OF THE COUNTY OF
BURLINGTON ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[April 2, 2012]

JUSTICE ALITO, concurring.

I join the opinion of the Court but emphasize the limits of today's holding. The Court holds that jail administrators may require all arrestees *who are committed to the general population of a jail* to undergo visual strip searches not involving physical contact by corrections officers. To perform the searches, officers may direct the arrestees to disrobe, shower, and submit to a visual inspection. As part of the inspection, the arrestees may be required to manipulate their bodies.

Undergoing such an inspection is undoubtedly humiliating and deeply offensive to many, but there are reasonable grounds for strip searching arrestees before they are admitted to the general population of a jail. As the Court explains, there is a serious danger that some detainees will attempt to smuggle weapons, drugs, or other contraband into the jail. Some detainees may have lice, which can easily spread to others in the facility, and some detainees may have diseases or injuries for which the jail is required to provide medical treatment. In addition, if a detainee with gang-related tattoos is inadvertently housed with detainees from a rival gang, violence may ensue.

Petitioner and the dissent would permit corrections officers to conduct the visual strip search at issue here

only if the officers have a reasonable basis for thinking that a particular arrestee may present a danger to other detainees or members of the jail staff.  But as the Court explains, corrections officers are often in a very poor position to make such a determination, and the threat to the health and safety of detainees and staff, should the officers miscalculate, is simply too great.

It is important to note, however, that the Court does not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population.  Most of those arrested for minor offenses are not dangerous, and most are released from custody prior to or at the time of their initial appearance before a magistrate.  In some cases, the charges are dropped.  In others, arrestees are released either on their own recognizance or on minimal bail.  In the end, few are sentenced to incarceration.  For these persons, admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable, particularly if an alternative procedure is feasible.  For example, the Federal Bureau of Prisons (BOP) and possibly even some local jails appear to segregate temporary detainees who are minor offenders from the general population.  See, *e.g.,* Brief for United States as *Amicus Curiae* 30; *Bull* v. *City & Cty. of San Francisco*, 595 F. 3d 964, 968 (CA9 2010) (en banc).*

———————

*In its *amicus* brief, the United States informs us that, according to BOP policy, prison and jail officials cannot subject persons arrested for misdemeanor or civil contempt offenses to visual body-cavity searches without their consent or without reasonable suspicion that they are concealing contraband.  Brief for United States 30.  Those who are not searched must be housed separately from the inmates in the general population.  *Ibid.*  Similarly, as described by the Court of Appeals in *Bull,* 595 F. 3d 964, the San Francisco County jail system distinguishes between arrestees who are eligible for release because, for instance, they can post bail within 12 hours and those who must be housed for an

The Court does not address whether it is always reasonable, without regard to the offense or the reason for detention, to strip search an arrestee before the arrestee's detention has been reviewed by a judicial officer. The lead opinion explicitly reserves judgment on that question. See *ante,* at 18–19. In light of that limitation, I join the opinion of the Court in full.

———————

extended period of time. *Id.,* at 968. The former are kept in holding cells at a temporary intake and release facility where they are pat searched and scanned with a metal detector but apparently are not strip searched. *Ibid.* The latter are transported to a jail with custodial housing facilities where they are then strip searched prior to their admission into the general population. *Ibid.*

# SUPREME COURT OF THE UNITED STATES

No. 10–945

ALBERT W. FLORENCE, PETITIONER *v.* BOARD OF
CHOSEN FREEHOLDERS OF THE COUNTY OF
BURLINGTON ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[April 2, 2012]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

The petition for certiorari asks us to decide "[w]hether the Fourth Amendment permits a . . . suspicionless strip search of every individual arrested for any minor offense . . . ." Pet. for Cert. i. This question is phrased more broadly than what is at issue. The case is limited to strip searches of those arrestees entering a jail's general population, see 621 F. 3d 296, 298 (CA3 2010). And the kind of strip search in question involves more than undressing and taking a shower (even if guards monitor the shower area for threatened disorder). Rather, the searches here involve close observation of the private areas of a person's body and for that reason constitute a far more serious invasion of that person's privacy.

The visually invasive kind of strip search at issue here is not unique. A similar practice is well described in *Dodge* v. *County of Orange*, 282 F. Supp. 2d 41 (SDNY 2003). In that New York case, the "strip search" (as described in a relevant prison manual) involved:

> "'a visual inspection of the inmate's naked body. This should include the inmate opening his mouth and

moving his tongue up and down and from side to side, removing any dentures, running his hands through his hair, allowing his ears to be visually examined, lifting his arms to expose his arm pits, lifting his feet to examine the sole, spreading and/or lifting his testicles to expose the area behind them and bending over and/or spreading the cheeks of his buttocks to expose his anus.  For females, the procedures are similar except females must in addition, squat to expose the vagina.'" *Id.,* at 46.

Because the *Dodge* court obtained considerable empirical information about the need for such a search in respect to minor offenders, and because the searches alleged in this case do not differ significantly, I shall use the succinct *Dodge* description as a template for the kind of strip search to which the Question Presented refers.  See, *e.g.*, App. to Pet. for Cert. 3a–4a (alleging that officers inspected his genitals from an arm's length away, required him to lift his genitals, and examined his anal cavity).

In my view, such a search of an individual arrested for a minor offense that does not involve drugs or violence—say a traffic offense, a regulatory offense, an essentially civil matter, or any other such misdemeanor—is an "unreasonable searc[h]" forbidden by the Fourth Amendment, unless prison authorities have reasonable suspicion to believe that the individual possesses drugs or other contraband. And I dissent from the Court's contrary determination.

I

Those confined in prison retain basic constitutional rights. *Bell* v. *Wolfish*, 441 U. S. 520, 545 (1979); *Turner* v. *Safley*, 482 U. S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution").  The constitutional right at issue here is the Fourth Amendment right to be free of "unreasonable searches and seizures."  And, as the Court

notes, the applicable standard is the Fourth Amendment balancing inquiry announced regarding prison inmates in *Bell* v. *Wolfish, supra.* The Court said:

> "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.,* at 559.

I have described in general terms, see *supra,* at 1–2, the place, scope and manner of "the particular intrusion." *Bell*, 441 U. S., at 559. I now explain why I believe that the "invasion of personal rights" here is very serious and lacks need or justification, *ibid.*—at least as to the category of minor offenders at issue.

## II

A strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy. We have recently said, in respect to a schoolchild (and a less intrusive search), that the "meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions." *Safford Unified School Dist. #1* v. *Redding*, 557 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 11). The Courts of Appeals have more directly described the privacy interests at stake, writing, for example, that practices similar to those at issue here are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, [and] repulsive, signifying degradation and submission." *Mary Beth G.* v.

*Chicago*, 723 F. 2d 1263, 1272 (CA7 1984) (internal quotation marks omitted); see also, *e.g.*, *Blackburn* v. *Snow*, 771 F. 2d 556, 564 (CA1 1985) ("'[A]ll courts'" have recognized the "'severe if not gross interference with a person's privacy'" that accompany visual body cavity searches (quoting *Arruda* v. *Fair*, 710 F. 2d 886, 887 (CA1 1983))). These kinds of searches also gave this Court the "most pause" in *Bell*, *supra*, at 558 (guards strip searched prisoners after they received outside visits). Even when carried out in a respectful manner, and even absent any physical touching, see *ante* at 4–5, 19, such searches are inherently harmful, humiliating, and degrading. And the harm to privacy interests would seem particularly acute where the person searched may well have no expectation of being subject to such a search, say, because she had simply received a traffic ticket for failing to buckle a seatbelt, because he had not previously paid a civil fine, or because she had been arrested for a minor trespass.

In *Atwater* v. *Lago Vista*, 532 U. S. 318, 323–324 (2001), for example, police arrested a mother driving with her two children because their seat belts were not buckled. This Court held that the Constitution did not forbid an arrest for a minor seatbelt offense. *Id.,* at 323. But, in doing so, it pointed out that the woman was held for only an hour (before being taken to a magistrate and released on bond) and that the search—she had to remove her shoes, jewelry, and the contents of her pockets, *id.,* at 355—was not "'unusually harmful to [her] privacy or . . . physical interests.'" *Id.,* at 354 (quoting *Whren* v. *United States*, 517 U. S. 806, 818 (1996)). Would this Court have upheld the arrest had the magistrate not been immediately available, had the police housed her overnight in the jail, and had they subjected her to a search of the kind at issue here? Cf. *County of Riverside* v. *McLaughlin*, 500 U. S. 44, 56 (1991) (presentment must be within 48 hours after arrest).

The petitioner, Albert W. Florence, states that his pre-

sent arrest grew out of an (erroneous) report that he had failed to pay a minor civil fine previously assessed because he had hindered a prosecution (by fleeing police officers in his automobile). App. 25a–26a. He alleges that he was held for six days in jail before being taken to a magistrate and that he was subjected to two strip searches of the kind in question. App. to Pet. for Cert. 3a.

*Amicus* briefs present other instances in which individuals arrested for minor offenses have been subjected to the humiliations of a visual strip search. They include a nun, a Sister of Divine Providence for 50 years, who was arrested for trespassing during an antiwar demonstration. Brief for Sister Bernie Galvin et al. as *Amici Curiae* 6. They include women who were strip-searched during periods of lactation or menstruation. *Id.*, at 11–12 (describing humiliating experience of female student who was strip searched while menstruating); *Archuleta* v. *Wagner*, 523 F. 3d 1278, 1282 (CA10 2008) (same for woman lactating). They include victims of sexual violence. Brief for Domestic Violence Legal Empowerment and Appeals Project et al. as *Amici Curiae*. They include individuals detained for such infractions as driving with a noisy muffler, driving with an inoperable headlight, failing to use a turn signal, or riding a bicycle without an audible bell. Brief for Petitioner 11, 25; see also *Mary Beth G., supra*, at 1267, n. 2 (considering strip search of a person arrested for having outstanding parking tickets and a person arrested for making an improper left turn); *Jones* v. *Edwards*, 770 F. 2d 739, 741 (CA8 1985) (same for violation of dog leash law). They include persons who perhaps should never have been placed in the general jail population in the first place. See *ante,* at 2 (ALITO, J. concurring) ("admission to general jail population, with the concomitant humiliation of a strip search, may not be reasonable" for those "whose detention has not been reviewed by a judicial officer and who could not be held in available facilities apart from the

general population").

I need not go on. I doubt that we seriously disagree about the nature of the strip search or about the serious affront to human dignity and to individual privacy that it presents. The basic question before us is whether such a search is nonetheless justified when an individual arrested for a minor offense is involuntarily placed in the general jail or prison population.

### III

The majority, like the respondents, argues that strip searches are needed (1) to detect injuries or diseases, such as lice, that might spread in confinement, (2) to identify gang tattoos, which might reflect a need for special housing to avoid violence, and (3) to detect contraband, including drugs, guns, knives, and even pens or chewing gum, which might prove harmful or dangerous in prison. In evaluating this argument, I, like the majority, recognize: that managing a jail or prison is an "inordinately difficult undertaking," *Turner*, 482 U. S., at 85; that prison regulations that interfere with important constitutional interests are generally valid as long as they are "reasonably related to legitimate penological interests," *id.*, at 89; that finding injuries and preventing the spread of disease, minimizing the threat of gang violence, and detecting contraband are "legitimate penological interests," *ibid.;* and that we normally defer to the expertise of jail and prison administrators in such matters, *id.,* at 85.

Nonetheless, the "particular" invasion of interests, *Bell*, 441 U. S., at 559, must be "'reasonably related'" to the justifying "penological interest" and the need must not be "'exaggerated.'" *Turner*, *supra,* at 87. It is at this point that I must part company with the majority. I have found no convincing reason indicating that, in the absence of reasonable suspicion, involuntary strip searches of those arrested for minor offenses are necessary in order to fur-

ther the penal interests mentioned. And there are strong reasons to believe they are not justified.

The lack of justification is fairly obvious with respect to the first two penological interests advanced. The searches already employed at Essex and Burlington include: (a) pat-frisking all inmates; (b) making inmates go through metal detectors (including the Body Orifice Screening System (BOSS) chair used at Essex County Correctional Facility that identifies metal hidden within the body); (c) making inmates shower and use particular delousing agents or bathing supplies; and (d) searching inmates' clothing. In addition, petitioner concedes that detainees could be lawfully subject to being viewed in their undergarments by jail officers or during showering (for security purposes). Brief for Petitioner 9; Tr. of Oral Arg. 7–8 ("Showering in the presence of officers is not something that requires reasonable suspicion"). No one here has offered any reason, example, or empirical evidence suggesting the inadequacy of such practices for detecting injuries, diseases, or tattoos. In particular, there is no connection between the genital lift and the "squat and cough" that Florence was allegedly subjected to and health or gang concerns. See Brief for Academics on Gang Behavior as *Amici Curiae*; Brief for Medical Society of New Jersey et al. as *Amici Curiae*.

The lack of justification for such a strip search is less obvious but no less real in respect to the third interest, namely that of detecting contraband. The information demonstrating the lack of justification is of three kinds. First, there are empirically based conclusions reached in specific cases. The New York Federal District Court, to which I have referred, conducted a study of 23,000 persons admitted to the Orange County correctional facility between 1999 and 2003. *Dodge,* 282 F. Supp. 2d, at 69. These 23,000 persons underwent a strip search of the kind described, *supra,* at 1. Of these 23,000 persons, the court

wrote, "the County encountered three incidents of drugs recovered from an inmate's anal cavity and two incidents of drugs falling from an inmate's underwear during the course of a strip search."  282 F. Supp. 2d, at 69.  The court added that in four of these five instances there may have been "reasonable suspicion" to search, leaving only one instance in 23,000 in which the strip search policy "arguably" detected additional contraband.  *Id.,* at 70.  The study is imperfect, for search standards changed during the time it was conducted.  *Id.,* at 50–51.  But the large number of inmates, the small number of "incidents," and the District Court's own conclusions make the study probative though not conclusive.

Similarly, in *Shain* v. *Ellison,* 273 F. 3d 56, 60 (CA2 2001),  the court received data produced by the county jail showing that authorities conducted body-cavity strip searches, similar to those at issue here, of 75,000 new inmates over a period of five years.  Brief for Plaintiff-Appellee-Cross-Appellant in No. 00–7061 etc. (CA2), p. 16 (citing to its App. 343a–493a).  In 16 instances the searches led to the discovery of contraband.  The record further showed that 13 of these 16 pieces of contraband would have been detected in a patdown or a search of shoes and outer-clothing.  In the three instances in which contraband was found on the detainee's body or in a body cavity, there was a drug or felony history that would have justified a strip search on individualized reasonable suspicion.  *Ibid.;* Brief for National Police Accountability Project as *Amicus Curiae* 10.

Second, there is the plethora of recommendations of professional bodies, such as correctional associations, that have studied and thoughtfully considered the matter.  The American Correctional Association (ACA)—an association that informs our view of "what is obtainable and what is acceptable in corrections philosophy," *Brown* v. *Plata,* 563 U. S. ___, ___ (2011) (slip op., at 43)—has promulgated a

standard that forbids suspicionless strip searches. And it has done so after consultation with the American Jail Association, National Sheriff's Association, National Institute of Corrections of the Department of Justice, and Federal Bureau of Prisons. ACA, Performance-Based Standards for Adult Local Detention Facilities, Standard 4–ALDF–2C–03, p. 36 (4th ed. 2004); Dept. of Justice, Federal Performance-Based Detention Standards Handbook, §C. 6, p. 99 (Feb. 23, 2011, rev.-2), http://www.justice.gov/ofdt/fpbds02232011.pdf (all Internet materials as visited Mar. 30, 2012, and available in Clerk of Court's case file); ACA, Core Jail Standards §1–CORE–2C–02, pp. vii, 23 (2010). A standard desk reference for general information about sound correctional practices advises against suspicionless strip searches. Dept. of Justice, National Institute of Corrections, M. Martin & T. Rosazza, Resource Guide for Jail Administrators 4, 113 (2004); see also Dept. of Justice, National Institute of Corrections, M. Martin & P. Katsampes, Sheriff's Guide to Effective Jail Operations 50 (2007).

Moreover, many correctional facilities apply a reasonable suspicion standard before strip searching inmates entering the general jail population, including the U. S. Marshals Service, the Immigration and Customs Service, and the Bureau of Indian Affairs. See U. S. Marshals Serv., Policy Directive, Prisoner Custody-Body Searches §9.1(E)(3) (2010), http://www.usmarshals.gov/foia/Directives-Policy/prisoner_ops/body_searches.pdf; Immigration and Customs Enforcement (ICE) Detention Standard: Searches of Detainees 1 (2008), http://www.ice.gov/doclib/dro/detention-standards/pdf/searches_of_detainees.pdf; ICE/DRO, Detention Standard: Admission and Release 4–5 (2008), http://www.ice.gov/doclib/dro/detention-standards/pdf/environmental_health_and_safety.pdf; Bureau of Indian Affairs, Office of Justice Servs., BIA Adult Detention Facility Guidelines 22 (Draft 2010). The Federal Bureau

of Prisons (BOP) itself forbids suspicionless strip searches for minor offenders, though it houses separately (and does not admit to the general jail population) a person who does not consent to such a search. See Dept. of Justice, BOP Program Statement 5140.38, p. 5. (2004), http://www. bop.gov/policy/progstat/5140_038.pdf.

Third, there is general experience in areas where the law has forbidden here-relevant suspicionless searches. Laws in at least 10 States prohibit suspicionless strip searches. See, *e.g.,* Mo. Stat. Ann. §544.193.2 (2002) ("No person arrested or detained for a traffic offense or an offense which does not constitute a felony may be subject to a strip search or a body cavity search . . . unless there is probable cause to believe that such person is concealing a weapon . . . or contraband"); Kan. Stat. Ann. §22–2521(a) (2007) (similar); Iowa Code §804.30 (2009) (similar); 725 Ill. Comp. Stat., ch. 725, §5/103–1(c) (2011) (similar but requiring "reasonable belief"); 501 Ky. Admin. Regs. 3:120, §3(1)(b) (2011) (similar); Tenn. Code Ann. §40–7–119 (2006) (similar); Colo. Rev. Stat. Ann. §16–3–405(1) (2011) (no strip search absent individualized suspicion unless person has been arraigned and court orders that suspect be detained); Fla. Stat. §901.211(2) (2010) (similar); Mich. Comp. Laws Ann. §764.25a(2) (2000) (similar); Wash. Rev. Code §10.79.130(1) (2010) (similar).

At the same time at least seven Courts of Appeals have considered the question and have required reasonable suspicion that an arrestee is concealing weapons or contraband before a strip search of one arrested for a minor offense can take place. See, *e.g., Roberts* v. *Rhode Island*, 239 F. 3d 107, 112–113 (CA1 2001); *Weber* v. *Dell*, 804 F. 2d 796, 802 (CA2 1986); *Logan* v. *Shealy*, 660 F. 2d 1007, 1013 (CA4 1981); *Stewart* v. *Lubbock Cty. Tex.*, 767 F. 2d 153, 156–157 (CA5 1985); *Masters* v. *Crouch*, 872 F. 2d 1248, 1255 (CA6 1989); *Mary Beth G.*, 723 F. 2d, at 1266, 1273; *Edwards*, 770 F. 2d, at 742; *Hill* v. *Bogans*,

735 F. 2d 391, 394 (CA10 1984). But see 621 F. 3d, at 311 (case below); *Bull* v. *City and County of San Francisco*, 595 F. 3d 964, 975 (CA9 2010) (en banc); *Powell* v. *Barrett*, 541 F. 3d 1298, 1307 (CA11 2008) (en banc). Respondents have not presented convincing grounds to believe that administration of these legal standards has increased the smuggling of contraband into prison.

Indeed, neither the majority's opinion nor the briefs set forth any clear example of an instance in which contraband was smuggled into the general jail population during intake that could not have been discovered if the jail was employing a reasonable suspicion standard. The majority does cite general examples from Atlantic County and Washington State where contraband has been recovered in correctional facilities from inmates arrested for driving under the influence and disorderly conduct. *Ante,* at 15. Similarly, the majority refers to information, provided by San Francisco jail authorities, stating that they have found handcuff keys, syringes, crack pipes, drugs, and knives during body-cavity searches, including during searches of minor offenders, including a man arrested for illegally lodging (drugs), and a woman arrested for prostitution and public nuisance ("bindles of crack cocaine"). Brief for City and County of San Francisco et al. as *Amici Curiae* 7–13; *Bull, supra,* at 969; *ante,* at 15. And associated statistics indicate that the policy of conducting visual cavity searches of *all* those admitted to the general population in San Francisco may account for the discovery of contraband in approximately 15 instances per year. *Bull, supra,* at 969.

But neither San Francisco nor the respondents tell us *whether reasonable suspicion was present or absent* in *any* of the 15 instances. Nor is there any showing by the majority that the few unclear examples of contraband recovered in Atlantic County, Washington State, or anywhere else could not have been discovered through a policy

that required reasonable suspicion for strip searches. And without some such indication, I am left without an example of any instance in which contraband was found on an individual through an inspection of their private parts or body cavities which could not have been found under a policy requiring reasonable suspicion. Hence, at a minimum these examples, including San Francisco's statistics, do not provide a significant counterweight to those presented in *Dodge* and *Shain.*

Nor do I find the majority's lack of examples surprising. After all, those arrested for minor offenses are often stopped and arrested unexpectedly. And they consequently will have had little opportunity to hide things in their body cavities. Thus, the widespread advocacy by prison experts and the widespread application in many States and federal circuits of "reasonable suspicion" requirements indicates an ability to apply such standards in practice without unduly interfering with the legitimate penal interest in preventing the smuggling of contraband.

The majority is left with the word of prison officials in support of its contrary proposition. And though that word is important, it cannot be sufficient. Cf. Dept. of Justice, National Institute of Corrections, W. Collins, Jails and the Constitution: An Overview 28–29 (2d ed. 2007) (Though prison officials often "passionately believed" similar requirements would lead to contraband-related security problems, once those requirements were imposed those "problems did not develop").

The majority also relies upon *Bell,* 441 U. S. 520, itself. *Ante,* at 5–6. In that case, the Court considered a prison policy requiring a strip search of *all* detainees after "contact visits" with unimprisoned visitors. 441 U. S., at 558. The Court found that policy justified. *Id.,* at 560. Contrary to the majority's suggestion, that case does not provide precedent for the proposition that the word of prison officials (accompanied by a "single instance" of empirical

example) is sufficient to support a strip search policy. *Ante,* at 6. The majority correctly points out that there was but "one instance" in which the policy had led to the discovery of an effort to smuggle contraband. *Bell*, 441 U. S., at 558. But the Court understood that the prison had been open only four months. *Id.,* at 526. And the Court was also presented with other examples where inmates attempted to smuggle contraband during contact visits. *Id.,* at 559.

It is true that in *Bell* the Court found the prison justified in conducting postcontact searches even as to pretrial detainees who had been brought before a magistrate, denied bail, and "committed to the detention facility only because no other less drastic means [could] reasonably assure [their] presence at trial." 441 U. S., at 546, n. 28. The Court recognized that those ordered detained by a magistrate were often those "charged with serious crimes, or who have prior records." *Ibid.* For that reason, those detainees posed at least the same security risk as convicted inmates, if not "a greater risk to jail security and order," and a "greater risk of escape." *Ibid.* And, of course, in *Bell*, both the inmates at issue and their visitors had the time to plan to smuggle contraband in that case, unlike those persons at issue here (imprisoned soon after an unexpected arrest).

The *Bell* Court had no occasion to focus upon those arrested for minor crimes, prior to a judicial officer's determination that they should be committed to prison. I share JUSTICE ALITO's intuition that the calculus may be different in such cases, given that "[m]ost of those arrested for minor offenses are not dangerous, and most are released from custody prior to or at the time of their initial appearance before a magistrate." *Ante,* at 2 (concurring opinion). As he notes, this case does not address, and "reserves judgment on," whether it is always reasonable "to strip search an arrestee before the arrestee's detention

has been reviewed by a judicial officer." *Ante,* at 3. In my view, it is highly questionable that officials would be justified, for instance, in admitting to the dangerous world of the general jail population and subjecting to a strip search someone with no criminal background arrested for jaywalking or another similarly minor crime, *supra,* at 5. Indeed, that consideration likely underlies why the Federal Government and many States segregate such individuals even when admitted to jail, and several jurisdictions provide that such individuals be released without detention in the ordinary case. See, *e.g.,* Cal. Penal Code Ann. §853.6 (West Supp. 2012).

In an appropriate case, therefore, it remains open for the Court to consider whether it would be reasonable to admit an arrestee for a minor offense to the general jail population, and to subject her to the "humiliation of a strip search," prior to any review by a judicial officer. *Ante,* at 2 (ALITO, J., concurring).

\*    \*    \*

For the reasons set forth, I cannot find justification for the strip search policy at issue here—a policy that would subject those arrested for minor offenses to serious invasions of their personal privacy. I consequently dissent.